**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

NAPOLEON J. A. EBARLE III,
individually and as the representative of a
class of similarly situated persons, and on
behalf of the Abbott Laboratories Health
Care Plan

                    Plaintiffs,

           v.

ABBOTT LABORATORIES; THE
BOARD OF DIRECTORS OF ABBOTT
LABORATORIES; ABBOTT
LABORATORIES EMPLOYEE
BENEFITS COMMITTEE; and
DOES 1–20,

                    Defendants.

Civil Action No. 26-cv-6834

**CLASS ACTION COMPLAINT**
JURY TRIAL DEMANDED

## NATURE OF THE ACTION

1.      Plaintiff Napoleon J. A. Ebarle III ("Plaintiff"), as representative of the class defined herein, and on behalf of the Abbott Laboratories Health Care Plan (the "Plan"), brings this action against Abbott Laboratories ("Abbott"), the Board of Directors of Abbott Laboratories (the "Board"), the Abbott Laboratories Employee Benefits Committee (the "Committee"), and Does 1–20 (collectively, "Defendants") for breaches of fiduciary duty under the Employee Retirement Income Security Act of 1974 ("ERISA"). 29 U.S.C. §§ 1001 *et seq.*

2.      Employers may provide healthcare benefits to employees. In a self-funded health benefit plan, employees contribute wages in the form of premiums deducted from their paycheck in exchange for healthcare insurance. When an employer chooses to provide healthcare in this manner, the retention of wages triggers ERISA's protections; premiums are ERISA plan assets. *United States v. Whiting*, 471 F.3d 792, 799 (7th Cir. 2006). Once triggered, ERISA requires

1

employers to use those premiums "solely in the interest of the participants and beneficiaries" and "with the care, skill, prudence, and diligence . . . that a prudent man acting in a like capacity and familiar with such matters would use[.]" 29 U.S.C. § 1104(a)(1)(A), (B).

3.　　Defendants have breached their fiduciary duties in their implementation of the Plan. They have done so by offering two, materially identical healthcare plans, one of which costs more than the other at every level of medical utilization. In other words, one plan financially dominates the other. When a fiduciary offers employees a choice among medical plan options, that duty includes a continuing obligation to monitor those options and remove imprudent ones. *Tibble v. Edison Int'l*, 575 U.S. 523, 528–30 (2015); *Hughes v. Nw. Univ.*, 595 U.S. 170, 175–77 (2022). Offering a financially dominated healthcare plan, where some employees pay more for the exact same insurance as other employees, is imprudent. *Barbich v. Nw. University*, No. 1:25-cv-06849 (N.D. Ill. Apr. 2, 2026). Defendants' breach has caused Plaintiff and the Class tens of millions of dollars in damages.

4.　　Although health insurance costs are distributed in complex and esoteric ways, financial domination can be understood simply. Consider two plans with the same provider network and the same covered services. The only difference between the two is the deductible: Plan A carries a $1,000 deductible; Plan B carries a $750 deductible. A lower deductible means insurance begins to offset out-of-pocket costs sooner. Specifically, as soon as the participant pays for medical costs out-of-pocket equal in value to the deductible. So, the idea goes, lower deductible, lower out-of-pocket costs.

5.　　That advantage, however, has a price. Additional premiums are necessary to reduce a deductible. If the additional premiums required to lower the deductible from $1,000 to $750 exceeds the maximum possible out-of-pocket savings of $250, then an employee who chooses

Plan B will pay more than an employee who chooses Plan A. This is true at every spending level, from zero to tens of thousands of dollars in claims. Plan B is financially dominated. No rational, fully informed employee would choose it.

6. But employees are not actuaries, and the research confirms what intuition suggests: lower-income workers, employees with chronic conditions, older employees, and women disproportionately select dominated options.[1] Participants are drawn to the promise of the lower deductible and lower out-of-pocket costs. But there is a hidden cost to a lower deductible: higher premiums and lost wages.

7. What a participant thinks they have saved in out-of-pocket costs, they ultimately lose three times over in higher premiums. The result is that the employees who can least afford to overpay are the ones most likely to do so. This is the false promise of the financially dominated plan.

8. Participants consistently choose dominated options in reliance on a fiduciary's implicit representation that every option on the menu is worth choosing. It is a fiduciary's duty to eliminate menu options that misuse plan assets by offering false promises.

9. That is what has happened here with Defendants' Plan. Defendants offered Plan participants access to both a "traditional" Preferred Provider Organization medical option (the "Traditional PPO") and a Health Investment Plan PPO medical option (the "HIP"). Both options use the identical BlueCross BlueShield ("BCBS") or UnitedHealthcare ("UHC") PPO network. But the Traditional PPO has a lower deductible than the HIP. Yet, because of the Traditional PPO's higher premiums, at every enrollment tier and every plausible level of utilization, the Traditional

---

[1] Bhargava, Loewenstein, Sydnor, *Choose To Lose: Health Plan Choices From A Menu With Dominated Options*, The Quarterly Journal of Economics at 1320–22 (2017).

3

PPO costs more. In other words, the Traditional PPO offers the same services as the HIP, but the Traditional PPO costs more. Every time.

10. Abbott's own enrollment-comparison document for the 2024 Plan Year makes this plain.[2] Abbott offers cost-comparison explanations for the HIP and the Traditional PPO. In its benefit highlights sheet, Abbott explains that the Traditional PPO "includes a lower deductible and out-of-pocket costs."[3] Despite the promise of savings, when accounting for the premium differential, the remaining deductible exposure is, in every scenario, more than outweighed by the Traditional PPO's premium penalty. Employees enrolled in the Traditional PPO therefore pay a premium for the same healthcare offered to employees enrolled in the HIP. When Abbott says that "over 95% of employees in the Traditional PPO actually would save money if enrolled in the HIP PPO."[4] That figure is incorrect: 100% of employees would save by switching from the Traditional PPO to the HIP.

11. Considering these losses in the aggregate over the Class period, Plaintiff and the Class lost tens of millions of dollars in the form of excess premium contributions, forgone employer HSA contributions, and avoidable out-of-pocket exposure. The Plan and its participants could have avoided these losses entirely had Defendants applied any reasonable fiduciary process.

12. And these losses are felt primarily by those who are least able to withstand the rising costs of healthcare: lower-income workers and the chronically ill. In 2024, roughly 10% of working families paid more than $14,800 on healthcare, inclusive of premiums and out-of-pocket expenses.[5] For families close to the poverty level, 14% of family income is spent on health

---

[2] Abbott Laboratories, *Abbott Employee Benefits Highlights 2024* at 3, available at https://cache.hacontent.com/ybr/R516/00472_ybr_ybrfndt/downloads/AbbottBenefitHighlightsGuide.pdf.

[3] *Id.*

[4] *Id.*

[5] Emma Curchin & John Schmitt, *The High Cost of Living: What Working Families Pay For Health Care*, Ctr. For Econ. & Policy Rsch. (Jan. 13, 2026), available at https://cepr.net/publications/high-cost-of-living-what-working-families-pay-for-health-care/.

insurance, including 9% on premiums alone.[6] Indeed, premium costs have increased 28% faster than wages since 2010.[7] Understandably, four in ten of insured adults worry about affording their monthly premium, and over 60% worry about affording their deductible.[8]

13.     And for the chronically ill, these problems are only compounded. Chronically ill patients comprise roughly 27% of private-insurance patients but nearly 60% of spending.[9] For patients with one or more chronic conditions, their healthcare costs range from three to fourteen times as much as patients without any chronic conditions.[10] For these individuals and families, the loss of between $424 and $5,082 per year is felt acutely.

14.     Plaintiff does not ask this Court to second-guess a close fiduciary judgment. Where, as here, a plan fiduciary offers an option that is more expensive than an identical alternative in every utilization scenario, the participants are given a "Hobson's choice." That is, no choice at all. Plaintiff and the Class have suffered the kind of concrete economic injury that ERISA was enacted to prevent. *See Barbich*, No. 1:25-cv-06849 (N.D. Ill. Apr. 2, 2026) (denying motion to dismiss on analogous facts). The existence of the HIP demonstrates that Defendants could have eliminated, redesigned, or repriced the dominated Traditional PPO. Instead, they did none of those things. Plaintiff and members of the Class have suffered because imprudent Plan management.

---

[6] Paul H. Keckley, *Affordability It Is More Than* Insurance, Healthcare Executive, available at
https://www.healthcareexecutive.org/archives/march-april-2021/affordability-it-is-more-than-insurance.
[7] *Id.*
[8] Cynthia Cox, et al., *Health Care Costs and Affordability*, KFF, (Oct. 8, 2025), available at
https://www.kff.org/health-costs/health-policy-101-health-care-costs-and-affordability/?entry=table-of-contents-
how-do-high-health-costs-affect-affordability-of-care.
[9] Kenneth E. Thorpe & Peter J. Joski, *The Association of Obesity and Chronic Conditions Treated as it Relates to the Growth in Health Care Spending by Source of Insurance, 2011–2022*, Partnership to Fight Chronic Disease, at 4 (Dec. 2025).
[10] *Chronic Conditions in the United States: A Study of Commercial Claims*, FAIR Health, at 9 (Feb. 2, 2026).

15.     In fact, Defendants profit from this arrangement. For one, by withholding wages in the form of premiums, Defendants lower their payroll and income tax burdens.[11] For another, Defendants earn income by investing employee premiums. Premiums are held in Abbott's general assets, and employee insurance claims are paid directly out of Abbott's operating budget.[12] This means that when participants pay higher premiums, Abbott increases its operating budget and its opportunity to earn income.

16.     Every pay period, then, Abbott's budget gets an influx of cash from deducting premiums from employee paychecks.[13] But insurance claims are paid later. That means, in the time between collecting premiums and later paying claims, Abbott can use this "cash float" to invest and earn income. In fact, earning income from employee premiums is a one of the reasons employers choose to fund employee benefits through their own general assets.[14] Compounding this problem, when premiums are comingled with general funds, employers are exempt from ERISA's disclosure and accounting requirements. 29 C.F.R. § 2520.104-44(a)–(c). Defendants collect premiums, earn income, and are not required to disclose or account for any of their investments, profits earned, or surplus left at the end of the plan period.

---

[11] *Reduce Tax Subsidies for Employment-Based Health Benefits*, Cong. Budget Office (Dec. 12, 2024), available at https://www.cbo.gov/budget-options/60953

[12] *DOL Enforcement Policy for Welfare Plans with Participant Contributions*, Technical Release No. 1992-01 (May 28, 1992), available at https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/technical-releases/92-01; *see also, e.g.*, Abbott Laboratories Health Care Plan Form 5500 – 2024, at 2.

[13] *Warren Buffett Explains The Genius Of The* Float, NPR: Planet Money, (Mar. 1, 2010), available at https://www.npr.org/sections/money/2010/03/warren_buffett_explains_the_ge.html

[14] *A Model Self-Funded Health Plan*, Self-Ins. Inst. of Am., Inc., at 1 (May 2009); *What is Self Funding*, Health Care Administrators Association, available at https://www.hcaa.org/page/selffunding; *Self-Funded Health Plans: Employer Guide*, OneDigital (May 14, 2025), available at https://www.onedigital.com/en-US/articles/the-employers-guide-to-self-funded-health-plans-benefits-risks-and-how-to-get-started/; *Self-Funding 101*, Strategic Benefit Resources, available at https://strategicbenefitresources.com/self-funding-101/; *Self-Funded Healh Insurance: The Complete Guide to Taking Control of Your Healthcare Costs*, Roundstone (Nov. 18, 2025), available at https://roundstoneinsurance.com/blog/how-self-funded-health-insurance-works/; Roger Lee Mendoza, *To Self-Insure or Not – That is the Question for a Large Group Health Plan*, 14 Int'l J. of Finance & Banking Studies 144, 144 (2025), available at https://www.ssbfnet.com/ojs/index.php/ijfbs/article/view/4509/2966.

6

17.     Defendants are thereby incentivized to raise the contribution cost for employees enrolled in the Traditional PPO option. Yet, it is precisely this arrangement that harms the most vulnerable employees.

18.     Plaintiff brings this action under ERISA §§ 502(a)(2) and 502(a)(3), 29 U.S.C. §§ 1132(a)(2)–(3), to recover losses to the Plan, to obtain equitable relief on behalf of the Class, and to prevent further breach.

## JURISDICTION AND VENUE

19.     Plaintiff brings this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), whereby participants in an employer-sponsored health insurance plan may pursue a civil action on behalf of the plan to remedy breaches and to obtain monetary and appropriate equitable relief, *id.* §§ 1109 and 1132.

20.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1) because this action arises under ERISA.

21.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because the Plan is administered in this district, the breaches giving rise to this action occurred in this district, and Defendants reside in this district.

## PARTIES

### I.     Plaintiff

22.     Plaintiff Napoleon J. A. Ebarle III is an adult resident of Woodbine, Georgia, and was a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). Mr. Ebarle began his employment at Abbott in 2020 as an Executive Assistant. He was enrolled in the Traditional PPO option from 2020 to 2023, in the employee-plus-spouse tier, and paid employee premium contributions under the rates published in Abbott's annual enrollment materials. Mr. Ebarle paid

more for medical coverage than he would have paid for the HIP option, which would have delivered equal or greater financial value at every utilization level.

23.     Prior to his employment at Abbott, Mr. Ebarle's wife had brain surgery in February 2020 to remove a tumor. As a result of that surgery, Mr. Ebarle's wife lost hearing in her right ear. When Mr. Ebarle was hired by Abbott, he chose the PPO because he believed it was the best option for his wife's continuing care by allowing him to select the providers she preferred. His wife was not able to work again until 2021, and she continues to need periodic care, including MRIs and diagnostic testing.

24.     Plaintiff has been financially injured by Defendants' unlawful conduct, and his compensation would have been higher if Defendants had not violated ERISA as described herein. *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 808 (7th Cir. 2013).

## II.     Defendants

25.     Abbott Laboratories ("Abbott") is an Illinois corporation with its principal place of business at 100 Abbott Park Road, Abbott Park, Illinois, 60064.

26.     Abbott is the Plan sponsor under 29 U.S.C. § 1002(16)(B).

27.     Abbott is the named fiduciary under 29 U.S.C. § 1102(a)(2).

28.     The Board of Directors of Abbott Laboratories (the "Board") is the governing body of Abbott and, at all relevant times, retained ultimate authority over the appointment, monitoring, and removal of plan fiduciaries. The Board is a fiduciary under 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority over the management of the Plan and its administration.

29.     The Abbott Laboratories Employee Benefits Committee (the "Committee") (or such functionally equivalent committee charged with day-to-day Plan administration) is a named fiduciary of the Plan under 29 U.S.C. § 1102(a)(2) and a fiduciary under 29 U.S.C. § 1002(21)(A) because it exercised discretionary authority over Plan design, investment of the Plan's HSA

employer contributions, and the selection, monitoring, and retention of Plan service providers, including the third-party administrator BCBS and UHC.

30.     Abbott may delegate its fiduciary responsibilities to any other person, persons, or entity. Defendants Does 1–20 are individuals and entities whose identities are presently unknown to Plaintiff but who, at relevant times, exercised discretionary authority or control over Plan administration or assets under 29 U.S.C. § 1002(21)(A)(i) and (iii).

<b><u>EMPLOYER-SPONSORED HEALTH INSURANCE</u></b>

31.     An employer may choose to offer health insurance as part of its package of compensation to employees. In sponsoring healthcare coverage, employers can choose from three basic options: full insurance, mixed-insurance (or hybrid funding), and self-insurance (or self-funding).

32.     In a fully-insured plan, the sponsor purchases health insurance and pays a fixed premium to the insurer. The insurer then assumes the full responsibility of paying employees' claims.

33.     In a mixed-insured (or level-funded) plan, the sponsor assumes responsibility for some healthcare benefits but transfers the risk for other benefits to an insurance company.

34.     As relevant to this case and the Plan, in a self-insured plan, the employer pays its enrollees' covered claims directly out of general corporate funds. A self-funded employer determines the scope of coverage, benefits to offer, pays medical claims, sets an employee's contribution limits, and assumes all the risk.

35.     As part of a self-funded plan, an employer typically retains a third-party administrator ("TPA"). A TPA is a conventional health insurer, like BlueCross BlueShield or UnitedHealthcare. The TPA's duties include enrollment, billing, claims adjudication, customer

9

service, and network management. Thus, the employer contracts out many of the duties of a traditional health insurer.

36.     In a self-funded health plan, the employer does not use an insurer or pay premiums to an insurance carrier, like BCBS. Instead, an employer typically rents provider networks from large insurance carriers to offer PPO-style or HMO-style benefits. Costs under this arrangement are distributed in two ways. First, the employer pays fixed costs, like stop-loss insurance and per-enrollee fees to the TPA for access to its provider network and claim processing. Second, the employer pays variable costs, like employee insurance claims. The employer pays these costs out of general assets or, less often, by establishing a plan trust.

37.     In other words, once a plan participant meets their deductible, the employer pays medical claims as they arise, up to a predetermined threshold known as the stop-loss deductible. Medical claims beyond the deductible and out-of-pocket max are paid by the employer out of their own assets—they are not paid by an insurance carrier, as would be the case in a fully-insured plan. An employer purchases separate stop-loss insurance to cover any claims beyond that threshold. In this way, employers insure against catastrophic and unanticipated claims.

38.     Prior to passage of the Affordable Care Act in 2010, only 8% of employer-sponsored health insurance plans were self-funded.[15] By 2021, however, that number had risen to 60% of all employer-sponsored plans.[16]

39.     There are a number of benefits to employers for using a self-funded plan.

40.     For one, the ACA exempts self-funded plans from federally mandated actuarial, medical, and financial regulations.[17] Exempted regulations include mandatory benefits like free

---

[15] Mendoza, *supra* n. 12, at 145.
[16] *Id.*
[17] *Id.* at 152.

preventative care, regulation of premium calculation, and the requirement that at least 80% to 85% of premium payments go towards medical care and quality improvements, which is called the medical loss ratio ("MLR").[18]

41.     Self-insured plans are also fully exempt from state-level regulation under ERISA.[19] For instance, under Illinois, insurers are required to file rate increases for state-level review.[20] Because ERISA fully exempts self-funded plans, employers are not required to submit premium increases to the state. Even then, ERISA exempts self-insured plans from many disclosure, accounting, and reporting requirements. 29 C.F.R. § 2520.104-44(a)–(c). This leaves self-funded plans largely unregulated.

42.     Being fully exempt from state regulation and from many of ERISA's requirements reinforces the other benefits employers receive by choosing self-funding. These benefits include: 1) cost-savings from paying only for actual claims and avoiding state-mandated benefits and other regulations, insurer premium taxes, insurer profit margin, and broker commissions/fees; 2) greater plan flexibility; 3) data transparency that enables employers to access claims data and adjust employee premiums; and 4) cash flow benefits due to MLR exemption and employer payment of claims as they arise, thereby retaining and earning interest on those funds.

**ABBOTTS'S PLAN**

43.     The Abbott Laboratories Health Care Plan is an "employee welfare benefit plan" within the meaning of 29 U.S.C. § 1002(1).

---

[18] *Id.* at 146.
[19] *Id.*
[20] *Current IL Premium Rate Filings*, Ill. Dep't of Ins., available at https://idoi.illinois.gov/consumers/consumerinsurance/health/current-il-premium-rate-filings.html.

44. The Plan is self-funded. Abbott retains both BCBS and UHC as third-party administrators, but bears the underlying medical-claims risk. Participant premium contributions are paid into and held by Defendants as part of their general assets.

45. For plan year 2024, Abbott offered full-time benefit-eligible employees two primary medical options: (a) a Traditional PPO option and (b) a HIP option. Both plans are offered to employees as part of their overall compensation. On information and belief, Abbott offered these two options throughout the entire class period.

46. Both options use are available under either: (1) the same BCBS PPO network or (2) the same UHC PPO network. Both provide the same in-network coverage.

47. The Traditional PPO is Abbott's low-deducible option, whereas the HIP is the high-deductible option. Therefore, the material differences between the two options are: (i) the deductible, (ii) the premium cost to the participant, and (iii) employer-funded HSA contributions, which are paid only to HIP enrollees.

| | HIP | Traditional PPO |
|---|---|---|
| **ANNUAL DEDUCTIBLE** | | |
| Individual | $1,750 | $200 |
| Family | $3,500 | $400 |
| **ANNUAL MEDICAL OUT-OF-POCKET MAXIMUM** | | |
| Individual | $4,800 | $3,600 |
| Family | $9,600 | $8,200 |
| **ANNUAL EMPLOYEE PREMIUM CONTRIBUTION** | | |
| Employee Only | $300.00 | $1,764.00 |
| Employee + Spouse | $600.00 | $4,006.00 |
| Employee + Child(ren) | $300.00 | $3,253.00 |

|  | HIP | Traditional PPO |
|---|---|---|
| Employee + Family | $600.00 | $5,282.00 |
| **EMPLOYER HSA SEED FUNDING** | | |
| Individual | **$200** | N/A |
| Family | **$400** | N/A |

48.     Abbott does not vary premium contributions by salary band; all full-time benefit-eligible employees pay the same premium amount per coverage tier. Although there are minor differences between the cost-sharing mechanisms in the two plans, none of these mechanisms rescue the Traditional PPO from being strictly dominated by the HIP:

(i)     **Embedded family deductible (Traditional PPO).** The Traditional PPO's embedded family deductible structure helps a family with one sick member reach coverage sooner, but this front-loads Traditional PPO savings—the savings cannot exceed the OOP-max gap, which is already swamped by premium.

(ii)    **Traditional PPO inpatient copay-bypass.** This shifts the timing of when Traditional PPO members hit OOP max but does not change the year-end total: at OOP max, both plans cap, and the premium spread eats any difference in cost-sharing.

(iii)   **Traditional PPO Rx percentage caps.** These caps protect heavy-Rx Traditional PPO users from catastrophic Rx bills, but again, they cannot drive Traditional PPO cost-sharing below the Traditional PPO OOP max—the Traditional PPO's worst-case combined exposure to $5,350 (EE) / $11,700 (Family)—both higher than HIP's combined cap.

(iv)    **HSA tax shelter**. The HIP's dominance is understated because the HSA's federal income- and FICA-tax savings on contributions, the tax-free growth, and the tax-free qualified withdrawals are not credited to the HIP enrollee. Adding even modest tax savings (~25–35% federal + state + FICA on HSA contributions) widens the dominance further.

49.     Both the Traditional PPO and the HIP use the same network of hospitals and doctors that accept a scheduled, discounted rate for services. Under either the Traditional PPO or the HIP, an employee can visit any provider in network without referral. Under both options, after the annual deductible is met, insurance covers 80% of any scheduled amount charged for services.

Under both options, charges from out-of-network providers are covered at 60%. Under both options, prescription drugs are covered at 75% retail and 80% by mail. In short, the options are nearly identical in material provision.

50.     Because the two options share the same BCBS or UHC PPO network, the same in-network providers and the same out-of-network structure, the HIP is not a "different" product that trades one dimension of value for another. It is the *same* product sold at a lower price, with additional employer dollars attached. The Traditional PPO and HIP cover the same medical services through the same provider network. They are not "different products" with different value propositions, but the same product at different price points.

51.     In sum, based on Abbott's published rate sheet, the 2024 full-time annual employee premium contribution differential between the Traditional PPO and the HIP is as follows:

| Coverage Tier | Traditional PPO Annual Premium Cost | HIP Annual Premium Cost | Annual Premium Gap (Traditional PPO – HIP) | Gap % |
|---|---|---|---|---|
| Employee Only | $1,764 | $300 | $1,464 | 488% |
| Employee + Spouse | $4,006 | $600 | $5,322.20 | 567.666% |
| Employee + Child(ren) | $3,253 | $300 | $4,884.88 | 984.333% |
| Family | $5,282 | $600 | $6,336.20 | 780.333% |

**ERISA Statutory Framework**

**I.     Overview of ERISA**

52.     ERISA is a "comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 90 (1983). The term "plan" means "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both[.]" 29 U.S.C. § 1002(3). An employee welfare benefit plan includes "any plan, fund, or program . . . established or maintained by an employer . . . for the purpose of

providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, . . . medical, surgical, or hospital care or benefits[.]" 29 U.S.C. § 1002(1).

53.     If an employer chooses to provide a healthcare plan to its employees, then ERISA imposes "various uniform standards, including rules concerning reporting, disclosure, and fiduciary responsibility," on that employer. *Shaw*, 463 U.S. at 91.

54.     Plan fiduciaries have a duty to manage plan assets under a "prudent man standard of care," that is, "solely in the interest of the participants and beneficiaries," and "with the care, skill, prudence, and diligence . . . that a prudent man acting in a like capacity and familiar with such matters would use" under the circumstances. 29 U.S.C. § 1104(a)(1)(B).

55.     Plan assets include the premiums deducted from employee paychecks paid in exchange for healthcare benefits. *Whiting*, 471 F.3d at 799; *Knudsen v. MetLife Grp., Inc.*, 117 F.4th 570, 580 (3d Cir. 2024); *Chelf v. Prudential Ins. Co. of Am.*, 31 F.4th 459, 467 (6th Cir. 2022).

56.     ERISA's fiduciary duties are "the highest known to the law." *Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan by & through Lyon v. Buth*, 99 F.4th 928 (7th Cir. 2024) (quoting *Halperin v. Richards*, 7 F.4th 534, 546 (7th Cir. 2021)).

## II.     Duty of Prudence

57.     Under the duty of prudence, a plan fiduciary is required to "discharge his duties with respect to a plan . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1). Section 1104(a)(1) imposes "strict standards of trustee conduct . . . derived from the common law of

trusts—most prominently, a standard of loyalty and a standard of care." *Central Se. & Sw. Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 570 (1985).

### III.     Duty to Monitor

58.     "In determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Tibble*, 575 U.S. at 528–29. Included among these traditional duties is that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones . . . separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Id.* at 529. "If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Hughes v. Nw. Univ.*, 595 U.S. 170, 176 (2022).

59.     "This continuing duty to monitor is a subset of the duty of prudence and includes two related components." *Hughes v. Nw. Univ.*, 63 F.4th 615, 626 (7th Cir. 2023) (internal citation omitted). The first component "requires a plan fiduciary to systematically review" its investments at inception and at regular intervals. *Id.* In the healthcare context, this means that a fiduciary must systematically review healthcare options.

60.     Second, "the duty of prudence requires a plan fiduciary to 'incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship.'" *Id.* at 627 (quoting *Tibble*, 575 U.S. at 529–30).

61.     In short, "plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options." *Hughes*, 595 U.S. at 176. If a fiduciary continues to offer an imprudent option, like a materially equivalent healthcare plan that costs employees more than a cheaper available plan, then "they have breached their duty" of prudence." *Id.*

16

## IV. Duty of Loyalty

62. "The duty of loyalty requires a plan fiduciary to 'discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries.'" *Albert v. Oshkosh Corp.*, 47 F.4th 570, 574 (7th Cir. 2022) (quoting 29 U.S.C. § 1104(a)(1)). "The reason for such a strict and exclusive duty of loyalty stems from the unique trust relationship, where a third party is entrusted with a settlor's property to be used for the beneficiary. Under this arrangement, 'neither the transferor nor the beneficiaries are well situated to monitor closely the actions of the trustee.'" *Halperin*, 7 F.4th at 546 (quoting Langbein & Fischel, *ERISA's Fundamental Contradiction: The Exclusive Benefit Rule*, 55 U. Chi. L. Rev. 1105, 1108 (1988)).

## V. Duty to Disclose Material Information

63. "The duty to disclose material information is the core of a fiduciary's responsibility, animating the common law of trusts long before the enactment of ERISA." *Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452, 466 (7th Cir. 2010) (quoting *Eddy v. Colonial Life Ins. Co. of Am.*, 919 F.2d 747, 750 (D.C. Cir. 1990)). "This duty of course includes an obligation not to mislead a plan participant or to misrepresent the terms or administration of an employee benefit plan, including an insurance plan." *Id.* "But the duty is not limited to that negative command. It includes an affirmative obligation to communicate material facts affecting the interests of beneficiaries." *Id.*

64. "[T]he trustee 'is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection in dealing with a third person.'" *Id.* (quoting Restatement 2d of Trusts § 173, cmt. d (1959)). "'[A] fiduciary has a duty to inform when it knows that silence may be harmful and cannot remain silent if it knows or should know that the beneficiary is laboring under a material misunderstanding of plan benefits,' and '[t]he duty of

17

loyalty requires a fiduciary to disclose any material information that could adversely affect a participant's interests.'" *Id.* (quoting *Kalda v. Sioux Valley Physician Partners, Inc.*, 481 F.3d 639, 644 (8th Cir. 2007)).

65. This general fiduciary duty to disclose material information stemming from the law of trusts is supplemented by a statutory obligation to provide information in a form "sufficiently accurate and comprehensive to reasonably apprise [] participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a).

## VI.    Fiduciary vs. Settlor Functions

66. Whether ERISA's fiduciary duties apply depends on whether an employer is exercising "fiduciary functions," or "settlor" functions. *Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996). An employer acts as a fiduciary when it "exercise[s] discretionary authority or control over plan administration or management, exercise[s] authority or control over management or disposition of the plan's assets, dispense[s] investment advice, or make[s] benefit determinations." *Bator v. District Council 4*, 972 F.3d 924, 931 (7th Cir. 2020) (citing 29 U.S.C. § 1002(21)(A); *Brooks v. Pactiv Corp.*, 729 F.3d 758, 765–66 (7th Cir. 2013)). This is a functional inquiry, and a court must look at whether an employer was "performing a fiduciary function when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000) (internal punctuation omitted).

67. Fiduciary functions include, among others, "the common transactions in dealing with a pool of assets: selecting investments, exchanging one instrument or asset for another, and so on." *Johnson v. Georgia-Pacific Corp.*, 19 F.3d 1184, 1189 (7th Cir. 1994). "'Settlor' functions, in contrast, include conduct such as establishing, funding, amending, or terminating a plan." *Coulter v. Morgan Stanley & Co. Inc.*, 753 F.3d 361, 367 (2d Cir. 2014). Although the decision to

create a benefits plan is a settlor function, "actions respecting the *administration* or *management* of plan 'assets' are subject to fiduciary standards." *Akers v. Palmer*, 71 F.3d 226, 230 (6th Cir. 1995).

68. As such, although Defendants' decision to offer health insurance is a settlor function, Defendants' imprudent use of Plaintiffs' assets to offer materially identical health plans at materially different price points is a fiduciary function. *See Sweda v. Univ. of Pa.*, 923 F.3d 320, 329 (3d Cir. 2019) ("When expenses are paid from plan assets, fiduciaries must ensure that the assets are used 'for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan.'" (quoting DOL Adv. Op. No. 2001-01A, 2001 WL 125092, at *2 (Jan. 18, 2001))). In fact, it is a violation of Defendants' fiduciary duties. It is a misuse of Plan assets to offer equal services for unequal prices.

## VII. Fiduciary Liability Under ERISA

69. Under 29 U.S.C. § 1109, fiduciaries to the Plan are personally liable to rectify any harm caused by their breaches of their fiduciary duties. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

70. 29 U.S.C. § 1132(a)(2) enables Plan participants and beneficiaries to bring civil actions to seek appropriate relief under 29 U.S.C. § 1109.

## DEFENDANTS' VIOLATIONS OF ERISA

71. Defendants violated each of these duties in their administration and implementation of the Plan. Defendants failed to implement a prudent process in assessing the fees for the

19

Traditional PPO option in light of the services provided. Indeed, the more costly Traditional PPO option offered to participants provides no financial or medical benefit when compared to the HIP.

72.     For the 2024 Plan Year, Abbott distributed to employees a side-by-side comparison document. The document walks employees through the various cost-sharing mechanisms of the Traditional PPO and the HIP. It explains that, even though the Traditional PPO requires greater employee contributions, it benefits from a lower deductible and lower out-of-pocket costs. Nevertheless, shortly after making this claim, Defendants admit that, by their own calculations, 95% of employees would pay less under the HIP than under the Traditional PPO.

73.     This document demonstrates that Defendants, through a prudent process, could have identified the domination. Their fiduciary obligation was to act on that knowledge by removing, redesigning, or repricing the Traditional PPO. Instead, Defendants offered a more expensive option and packaged it as cost-effective. Defendants have violated their core duties under ERISA.

74.     Defendants failed to take the most basic remedial steps available to a fiduciary confronting a dominated plan option. For instance, they did not reprice the Traditional PPO to the break-even level. Nor did they restructure employer HSA contributions to eliminate the net economic loss the Traditional PPO imposes. A prudent fiduciary would have taken corrective action. *See Tibble*, 575 U.S. at 530 ("Under trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones."); *Hughes*, 63 F.4th at 630–31 (prudence inquiry is context-specific and centers on the process). In fact, approximately half of firms succeed in offering non-dominated options.[21] Yet, despite evidence in the market that such equality is possible, Defendants continue to offer a financially dominated benefit option.

---

[21] How Common are Dominated Health Options? Evidence from Employer Health Benefits with High-Deductible Plans, at 30.

75.     Additional utilization scenarios demonstrate that a participant enrolled in the HIP pays less than a participant enrolled in the Traditional PPO at every coverage tier. Shown below are four cost-curve charts showing that the HIP strictly dominates the Traditional PPO plan for every tier and at every level of medical utilization. Losses per participant range between $424 and $5,082 per year:



76. This pattern, where a higher-priced option never outperforms its lower-priced twin, is the textbook case of a "dominated" plan design. *See* Saurabh Bhargava, George Loewenstein & Justin Sydnor, *Choose to Lose: Health Plan Choices from a Menu with Dominated Option*, 132 Q.J. Econ. 1319 (2017) (finding that 61% of a large employer's workforce elected financially dominated health options, at measurable welfare cost).

77. Plaintiff alleges, consistent with the Bhargava *et al.* finding, that approximately 61% of eligible Abbott employees have enrolled in the dominated Traditional PPO option across the class period. The precise enrollment figures for each plan year are in Defendants' exclusive possession and will be confirmed through discovery.

78. Other evidence found in Defendants' public federal findings raise the inference that Defendants have failed to implement a prudent process to monitor the Plan's assets. ERISA requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B). Process, not outcome, is the measure of prudence. *Hughes*, 63 F.4th at 630.

79. Plaintiff's allegations here are rooted in identifiable process gaps visible on the face of Defendants' own public filings. Abbot's Form 5500 filings submitted to the Department of Labor support the inference that Defendants have violated their fiduciary duties. The Form 5500-series was developed for employee benefit plans to satisfy annual reporting requirements under ERISA and the Internal Revenue Code. For instance, plans must report on medical carrier relationship, brokerage relationships, and the total number of premiums collected.

80. Abbott's 2024 Form 5500 filing discloses no broker, consultant, or benefits adviser as receiving any compensation tied to the selection or design of Abbott's medical plan options.

22

That gap is diagnostic: a prudent fiduciary selecting medical plan options of this scale—i.e., those covering more than 32,000 participants—retains and documents the work of a benefits consultant performing actuarial-equivalence, benchmarking, and plan-design testing. Defendants' filings disclose no such engagement. The lack of prudence in seeking expert advice in developing the plan menu is obvious: financial domination has resulted.

81. Finally, by failing to communicate to Plan participants that enrolling in the Traditional PPO option results in the highest payroll deduction for premiums while providing no additional financial benefit over the HIP, Defendants failed to disclose material information in breach of their duties under ERISA.

82. That participants had the opportunity to enroll in either option is no defense. "[P]articipants' ultimate choice" cannot "excuse allegedly imprudent decisions by [Defendants]." *Hughes*, 595 U.S. at 176. "Plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options." *Id.* By continuing to offer the Traditional PPO option while it provides no additional benefits to participants despite its high premiums, Defendants have breached their fiduciary duty and their duty to disclose this material information.

## CLASS ACTION ALLEGATIONS

83. Plaintiff brings this action as a class action under Federal Rule of Civil Procedure 23 on behalf of the following Class:

> All persons who, at any time on or after June 10, 2020, through the date of judgment, were full-time benefit-eligible employees of Abbott Laboratories and who were enrolled for at least a full year in the Traditional PPO medical option offered under the Abbott Laboratories Health Care Plan. Excluded from the class are Defendants, their immediate family members, officers and directors of Defendants, any officers or employees of Defendants with responsibility for the Plan's administrative functions, and any judicial officer presiding over this action.

84. **Numerosity.** The Class satisfies the numerosity requirement of Fed. R. Civ. P. 23(a)(1) because, upon information and belief, it is comprised of thousands of persons. The number of Class members is so large that joinder of all its members is impractical.

85. **Commonality.** This case satisfies the requirements of Fed. R. Civ. P. 23(a)(2) because it presents numerous common questions of law and fact which predominate over any questions affecting individual Class members, including but not limited to: (i) whether Defendants owed Class members fiduciary duties under ERISA; (ii) whether the Traditional PPO option was financially dominated by the HIP option during the class period; (iii) whether Defendants' process for selecting and retaining the Traditional PPO option was prudent; (iv) whether Defendants' enrollment communications were materially misleading or contained material omissions; and (v) the proper measure of Plan-wide losses.

86. **Typicality.** Plaintiff's claims are typical of the Class members' claims. He participated in the Plan, was a full-time employee of Abbott, enrolled in the Traditional PPO option during the class period, and was subject to the same Traditional PPO options as other Class members. Defendants managed the Plan collectively and treated Plaintiff consistently with other Class members. Defendants' imprudent actions and omissions affected all class members similarly.

87. **Adequacy.** Plaintiff is an adequate representative of the Class because he participated in the Plan during the Class Period, has no interest that conflicts with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent attorneys to represent the Class.

88. **Rule 23(b)(1).** Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of inconsistent or varying

24

adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan. Adjudications by individual participants and beneficiaries regarding the alleged breaches of fiduciary duties, and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

89.     **Rule 23(b)(2).** Additionally, or in the alternative, certification under Rule 23(b)(2) is appropriate because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole. Plaintiff seeks reformation of the Plan, which will benefit him and other Plan participants.

90.     **Rule 23(b)(3).** Additionally, or in the alternative, this action may be certified as a class under Rule 23(b)(3). A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and it is impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no Class member has an interest in individually controlling the prosecution of this matter, and Plaintiff is aware of no difficulties likely to be encountered in the management of this matter as a class action.

## CAUSES OF ACTION

### COUNT I
**Breach of Fiduciary Duty**
**Offering Dominated Option**

91.  Plaintiff incorporates all preceding paragraphs as if fully set forth.

92.  Defendants are or were fiduciaries of the Plan under 29 U.S.C. § 1002(21).

93.  ERISA § 404(a) requires a fiduciary to discharge its duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use." This is a continuing duty. *Tibble*, 575 U.S. at 530. This includes the duty to ensure that each healthcare option within the Plan is reasonable, evaluating and monitoring the Plan's options on an ongoing basis, and removing imprudent ones.

94.  A prudent fiduciary, acting in the circumstances then prevailing, would have identified the financial domination of the Traditional PPO option and taken timely action to eliminate, redesign, or reprice it. A prudent fiduciary would have monitored premiums, deductibles, coinsurance rates, and out-of-pocket maximums of the two options to ensure that no option was financially dominated. Participants' enrollment elections do not excuse Defendants' imprudent retention of a dominated option. *Hughes*, 595 U.S. at 176 ("[P]articipants' ultimate choice" cannot excuse "imprudent decisions.").

95.  Defendants failed to discharge this duty. On information and belief, they retained a dominated plan option through every plan year at issue and continue to offer it for 2026. Defendants' own Form 5500 filings disclose no broker, consultant, or adviser compensated for medical plan-design work, and no Schedule C filing, which collectively supports the inference that Defendants conducted no rigorous benchmarking, no actuarial-equivalence analysis against the

26

HIP, and no documented request for proposals that meaningfully evaluated the Traditional PPO's economic performance for participants.

96. Defendants' fiduciary breach resulted in significant losses to the Plan and its participants in the form of excessive healthcare expenses, including through payroll deductions and lost wages. Each Defendant is liable for the losses that resulted from these fiduciary breaches, as well as equitable relief and other relief as provided by ERISA. See 29 U.S.C. §§ 1109(a), 1132(a)(2)–(3).

<u>**COUNT II**</u>
**Breach of Fiduciary Duty**
**Failure to Inform**

97. Plaintiff incorporates all preceding paragraphs as if fully set forth.

98. Defendants are or were fiduciaries of the Plan under 29 U.S.C. § 1002(21).

99. The duty of loyalty encompasses a duty to communicate with participants, including a duty not to make materially misleading statements and not to omit material information where silence would be misleading. *See Howell v. Motorola, Inc.*, 633 F.3d 552, 570–71 (7th Cir. 2011); *Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452, 466 (7th Cir. 2010).

100. Defendants failed to disclose—in a clear, prominent, and actionable manner—the material fact established by Defendants' own comparison math: the Traditional PPO is projected to cost participants more than the HIP in every utilization scenario.

101. Defendants knew, from their own published 2024 enrollment-comparison document, that the Traditional PPO was financially dominated. They nonetheless presented it to participants as a comparable choice without disclosing the per-scenario dollar penalty.

102. A reasonable participant making an enrollment decision would have considered that fact material. Defendants' communication strategy—burying the domination in a secondary

document—made silence misleading and impaired participants' ability to make informed elections.

103. Defendants' failure to disclose the domination breached the duty of loyalty and caused the Class economic loss.

## COUNT III
### Breach of Fiduciary Duty
### Failure to Monitor

104. Plaintiff incorporates all preceding paragraphs as if fully set forth.

105. The Board had the authority to appoint, remove, and monitor the Committee and other Plan fiduciaries not named in this Complaint. That authority carries with it the fiduciary duty to monitor those appointees' performance and to remedy known breaches.

106. The Board failed to establish or follow a process reasonably calculated to assess whether the Committee was performing its fiduciary functions with respect to medical plan-option selection and enrollment communications. Had the Board exercised reasonable monitoring, the Traditional PPO's financial domination would have been raised, discussed, and remedied.

107. The Board breached its fiduciary monitoring duties by, among other things: (a) failing to monitor and evaluate the performance of Defendants and any other delegated fiduciaries; (b) failing to monitor the processes by which the Plan's health benefit options were selected, monitored, and retained, which would have alerted a prudent fiduciary to breaches; (c) failing to monitor the processes or systems of communication to convey material facts to Plan participants; and (d) failing to remove any other delegated fiduciaries whose performance was inadequate in that they selected and retained imprudent health benefit options, all to the detriment of the Plan and its participants.

108.     Each Defendant is also liable as a co-fiduciary under ERISA § 405(a) for (a) knowingly participating in another fiduciary's breach, (b) enabling such breach by failing to discharge its own duties, and (c) failing to make reasonable efforts to remedy known breaches.

109.     Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Defendants are liable to restore to the Plan and its participants all losses suffered as a result of the fiduciary breaches that resulted from its failure to properly monitor its appointed fiduciaries to the Plan.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class, respectfully requests that this Court enter judgment against Defendants and grant the following relief:

A.     Certify this action as a class action under Federal Rule of Civil Procedure 23 and appoint Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Declare that Defendants breached their fiduciary duties under ERISA;

C.     Order Defendants personally to make good to the Plan and its participants all losses incurred as a result of the breaches of fiduciary duties described herein, and to restore the Plan to their position but for this unlawful conduct;

D.     Grant such other equitable or remedial relief under ERISA as the Court deems appropriate, including (i) surcharge against Defendants for ill-gotten gains; (ii) reformation of the Plan to eliminate or reprice the dominated Traditional PPO option; (iii) disgorgement; (iv) an accounting; and (v) an injunction against continued maintenance of a dominated plan option;

E.     An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties

F.     Award pre- and post-judgment interest at the maximum lawful rate; and

G.     Award reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine; and

H.     Grant such other and further relief as the Court deems just and proper.

29

Date:   June 10, 2026                                        Respectfully submitted,

                                                             /s/ *Ivan V. Parfenoff*
                                                             Xiao Wang
                                                             xiao@throughline.law
                                                             Ivan V. Parfenoff
                                                             Throughline Law
                                                             745 5th Ave #500
                                                             New York, NY 10151
                                                             Telephone: (312) 909-0020
                                                             ivan@throughline.law