**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NAPOLEON J. A. EBARLE III, ROBBIN JOHNSON, MICHAEL GULOTTA, and SARA LUNDBORG, individually and as representatives of a class of similarly situated persons, and on behalf of the Abbott Laboratories Health Care Plan,<br><br>Plaintiffs,<br><br>v.<br><br>ABBOTT LABORATORIES, THE BOARD OF DIRECTORS OF ABBOTT LABORATORIES; ABBOTT LABORATORIES EMPLOYEE BENEFITS COMMITTEE; and DOES 1–20,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 1:26-cv-06834<br><br>Hon. John Robert Blakey<br><br>**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiffs Napoleon J. A. Ebarle III, Robbin Johnson, Michael Gulotta, and Sara Lundborg (collectively, "Plaintiffs"), individually and as representatives of the class defined below, and on behalf of the Abbott Laboratories Health Care Plan (the "Plan"), for their Amended Consolidated Class Action Complaint against Abbott Laboratories ("Abbott"), the Board of Directors of Abbott Laboratories (the "Board"), the Abbott Laboratories Employee Benefits Committee (the "Committee"), and Does 1–20 (collectively, "Defendants"), allege as follows:

## PRELIMINARY STATEMENT REGARDING CONSOLIDATION

1. This Amended Consolidated Class Action Complaint is filed in the above-captioned consolidated action, comprising *Ebarle v. Abbott Laboratories et al.*, No. 1:26-cv-06834 (filed June 10, 2026), and *Johnson et al. v. Abbott Laboratories*, No. 1:26-cv-08304 (filed July 14, 2026). Both actions are pending in this District, are brought on behalf of the same Plan, allege breaches of the same fiduciary duties under the Employee Retirement Income Security Act

of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, and arise from the same course of conduct: Defendants' offering and retention of a healthcare option that significantly overcharged Plan participants and beneficiaries.

2. By Minute Order dated August 25, 2026 (Dkt. 27), this Court granted Defendants' unopposed motion to reassign and consolidate the two actions as related cases under Local Rule 40.4. Pursuant to that Order, Plaintiffs filed a Consolidated Class Action Complaint on September 15, 2026 (Doc. 32), which named all plaintiffs and defendants from both actions and carried forward all claims asserted in each. Plaintiffs now file this Amended Consolidated Class Action Complaint. This is the operative complaint for the consolidated action.

## NATURE OF THE ACTION

3. This is a case about excessive healthcare costs charged to Plaintiffs and other Plan participants. Defendants offered two healthcare options to Plan participants that provided the *same* medical coverage through the same provider networks. One option, the Traditional PPO, cost participants more. The other, the Health Investment Plan PPO (the "HIP PPO" or "HIP"), cost participants less. At every coverage tier and virtually every level of medical utilization, participants enrolled in the Traditional PPO paid more for the same coverage than they would have paid under the HIP PPO. Defendants knew, or should have known, that participants who chose the more expensive option (i.e., the Traditional PPO) would virtually *always* pay more for identical healthcare coverage. Yet for years Defendants continued to offer that more expensive health insurance option to Plan participants.

4. Employers may provide healthcare benefits to employees. In a self-funded health benefit plan, employees contribute wages in the form of premiums deducted from their paychecks in exchange for healthcare coverage. When an employer chooses to provide healthcare in this

manner, the retention of wages triggers ERISA's protections; premiums are ERISA plan assets. *United States v. Whiting*, 471 F.3d 792, 799 (7th Cir. 2006). Once triggered, ERISA requires employers to discharge their fiduciary duties "solely in the interest of the participants and beneficiaries" and "with the care, skill, prudence, and diligence . . . that a prudent man acting in a like capacity and familiar with such matters would use[.]" 29 U.S.C. § 1104(a)(1), (a)(1)(B).

5. Defendants breached their fiduciary duties by offering two materially identical healthcare options, one of which cost more than the other at virtually every level of medical utilization. When a fiduciary offers employees a choice among plan options, that duty includes a continuing obligation to monitor those options and remove imprudent ones. *Tibble v. Edison Int'l*, 575 U.S. 523, 528–30 (2015); *Hughes v. Nw. Univ.*, 595 U.S. 170, 175–77 (2022). Offering a healthcare option that requires some employees to pay more for effectively the same coverage as other employees is imprudent.

6. While no rational, fully informed employee would choose a healthcare option that is more expensive than another that offers the same coverage, employees are not actuaries, and economic research confirms that substantial numbers of employees presented with imprudent options will nonetheless select them.[1] The reason is straightforward: participants are drawn to the promise of a lower deductible but often miss the hidden costs of the higher premiums that may accompany the lower deductible option.

7. In other words, apparent savings from lower out-of-pocket costs are more than offset by higher payroll contributions. What a participant believes they have saved in out-of-pocket

---

[1] Saurabh Bhargava, George Loewenstein & Justin Sydnor, *Choose To Lose: Health Plan Choices From A Menu With Dominated Options*, 132 Q.J. ECON. 1319, 1320–22 (2017), available at https://www.cmu.edu/dietrich/sds/docs/loewenstein/ChoseLose.pdf, archived at https://perma.cc/7YF4-6HWB.

costs, they lose with excess in higher premiums. This is the false promise of what economists call a "financially dominated" healthcare option.

8. Participants consistently choose healthcare options that are always more expensive because fiduciaries implicitly and explicitly represent that every option on the menu is worth choosing. However, it is a fiduciary's duty to eliminate menu options that are counter to the interests of Plan participants and their beneficiaries.

9. That is what happened here. Defendants offered Plan participants access to both the Traditional PPO and the HIP PPO.[2] Both options used the identical BlueCross BlueShield ("BCBS") or UnitedHealthcare ("UHC") PPO networks and provided the same in-network medical coverage. But because of the Traditional PPO's substantially higher premiums, at every enrollment tier and virtually every plausible level of utilization, the Traditional PPO cost more. In other words, the Traditional PPO offered the same covered services as the HIP PPO, but cost more—virtually every time.

10. Considering these losses in the aggregate over the class period, Plaintiffs and the putative class lost millions of dollars in the form of excess premium contributions, forgone employer contributions, and avoidable out-of-pocket expenses. The Plan and its participants could have avoided these losses entirely had Defendants used a reasonable fiduciary process.

11. Where, as here, a plan fiduciary offers an option that is more expensive than an identical alternative in virtually every utilization scenario, participants are given a Hobson's choice—no choice at all. The existence of the HIP PPO demonstrates that Defendants could have eliminated, redesigned, or repriced the dominated Traditional PPO. Instead, they did none of those

---

[2] During the class period, Defendants also offered a third health insurance option: the Surest option, which offered different coverage than the Traditional PPO and the HIP PPO, and thus is not at issue.

things. And because the Plan was self-funded, every dollar a participant overpaid or forewent in HSA contributions was a dollar the Plan accrued.

12. Plaintiffs bring this action under ERISA §§ 502(a)(2) and 502(a)(3), 29 U.S.C. § 1132(a)(2)–(3), to recover losses to the Plan, to obtain appropriate equitable and injunctive relief on behalf of the Plan and the Class, and to prevent further breaches.

## PARTIES

### A. Plaintiffs

13. Plaintiff **Napoleon J. A. Ebarle III** is an adult resident of Woodbine, Georgia, and was a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). Mr. Ebarle began his employment at Abbott in 2020 as an Executive Assistant. He was enrolled in the Traditional PPO option from 2020 to 2023, in the Employee-Plus-Spouse tier, and paid employee premium contributions under the rates published in Abbott's annual enrollment materials.

14. Before Mr. Ebarle's employment at Abbott, his wife had brain surgery in February 2020 to remove a tumor, and as a result lost hearing in her right ear. When Mr. Ebarle was hired, he chose the Traditional PPO because he believed it was the best option for his wife's continuing care, which includes periodic MRIs and diagnostic testing.

15. Mr. Ebarle has been financially injured by Defendants' unlawful conduct because he paid more in healthcare costs than he would have paid had Defendants prudently removed the Traditional PPO from the Plan menu.

16. Plaintiff **Robbin Johnson** resides in Round Lake Beach, Illinois. Ms. Johnson participated in the Plan from approximately 2020 to September 2025, in the Employee-Only tier of coverage, and was enrolled in the Traditional PPO. She has been financially injured by Defendants' unlawful conduct because she paid more in healthcare costs than she would have paid had Defendants prudently removed the Traditional PPO from the Plan menu.

17. Plaintiff **Michael Gulotta** resides in Round Lake Heights, Illinois. Mr. Gulotta participated in the Plan from approximately 2001 through the present, is a current participant in the Family tier of coverage and has been enrolled in the Traditional PPO for almost the entire duration of his employment with Abbott. He has been financially injured by Defendants' unlawful conduct because he paid more in healthcare costs than he would have paid had Defendants prudently removed the Traditional PPO from the Plan menu.

18. Plaintiff **Sara Lundborg** is Mr. Gulotta's domestic partner and is currently covered under the Traditional PPO through Mr. Gulotta's enrollment. As a beneficiary covered by that enrollment who also used covered services and treatments, Ms. Lundborg was injured by Defendants' unlawful conduct because she incurred higher healthcare costs than she would have incurred under the HIP PPO. Ms. Lundborg formerly worked for Abbott.

**B. Defendants**

19. Defendant **Abbott Laboratories** is an Illinois corporation with its principal place of business at 100 Abbott Park Road, Abbott Park, Illinois 60064. Abbott's primary business is developing, manufacturing, and selling medical and health-related products.

20. Abbott is the Plan sponsor under 29 U.S.C. § 1002(16)(B) and is identified in the governing Plan documents as the Plan Administrator and a named fiduciary responsible for the operation and administration of the Plan. Abbott is a named fiduciary under 29 U.S.C. § 1102(a)(2) and a fiduciary under 29 U.S.C. § 1002(21)(A) because it exercises discretionary authority and control over Plan administration and management and over the disposition of Plan assets.

21. The Plan is administered through Abbott's Corporate Benefits Department, including its Divisional Vice President of Compensation and Benefits, who exercises discretionary authority and control over Plan administration. Claims administration is delegated to third-party

administrators, including BCBS for medical claims and Express Scripts for prescription-drug benefits.

22. Defendant the **Board of Directors of Abbott Laboratories** is the governing body of Abbott and, at all relevant times, retained ultimate authority over the appointment, monitoring, and removal of Plan fiduciaries. The Board is a fiduciary under 29 U.S.C. § 1002(21)(A) because it exercised discretionary authority over the management and administration of the Plan.

23. Defendant the **Abbott Laboratories Employee Benefits Committee** (or such functionally equivalent body charged with day-to-day Plan administration) is a named fiduciary of the Plan under 29 U.S.C. § 1102(a)(2) and a fiduciary under 29 U.S.C. § 1002(21)(A) because it exercised discretionary authority over Plan design, investment of the Plan's health savings account ("HSA") employer contributions, and the selection, monitoring, and retention of Plan service providers, including the third-party administrators BCBS and UHC.

24. Abbott may delegate its fiduciary responsibilities to other persons or entities. Defendants **Does 1–20** are individuals and entities whose identities are presently unknown to Plaintiffs but who, at relevant times, exercised discretionary authority or control over Plan administration or assets within the meaning of 29 U.S.C. § 1002(21)(A)(i) and (iii). To the extent Abbott delegated fiduciary responsibilities to any such person or entity, that person or entity is a fiduciary to the extent it exercised discretionary authority or control over Plan management or administration. *See* 29 U.S.C. §§ 1002(21)(A), 1105(c).

## JURISDICTION AND VENUE

25. **Subject-matter jurisdiction.** This Court has "federal question" subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1) because this action arises under ERISA.

26. **Venue.** Venue is proper in this District pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because the Plan is administered in this District, the breaches giving rise to this action occurred in this District, and Defendants reside and may be found in this District.

27. **Standing.** Plaintiffs bring this action pursuant to 29 U.S.C. §§ 1132(a)(2) and (a)(3), which provide that participants in an employer-sponsored health insurance plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. §§ 1109 and 1132.

28. Plaintiffs also have standing because they participated in the Plan, enrolled in the Traditional PPO, and personally incurred excessive costs for their healthcare coverage. Had Defendants acted prudently and removed the more expensive Traditional PPO option, Plaintiffs would have paid less for equivalent coverage. Plaintiffs therefore suffered a concrete financial injury that is fairly traceable to Defendants' conduct and redressable through the relief sought here.

## BACKGROUND

### I. EMPLOYER-SPONSORED HEALTH PLANS

29. Employer-sponsored health coverage is the primary way working Americans obtain access to medical care. As of 2025, more than 165 million individuals under 65 received health insurance through employer-sponsored health plans in the United States.[3]

---

[3] *See* Gary Claxton, Matthew Rae & Aubrey Winger, *Health Policy 101: Employer-Sponsored Health Insurance 101*, KFF (Apr. 15, 2026), at 1, available at https://www.kff.org/health-costs/health-policy-101-employer-sponsored-health-insurance/, archived at https://perma.cc/B83A-2BMN.

30. Approximately 81% of workers are eligible to enroll in employer-sponsored insurance.[4] A substantial majority (75%) of those workers enroll in such coverage when it is offered.[5]

31. In sponsoring healthcare coverage, employers can choose from three basic options: full insurance, mixed insurance (or hybrid funding), and self-funding (or self-insurance).

32. In a fully insured plan, the sponsor purchases health insurance and pays a fixed premium to the insurer. The insurer then assumes the responsibility of paying employees' claims.

33. In a mixed-insured (or level-funded) plan, the sponsor assumes responsibility for some healthcare benefits but transfers the risk for other benefits to an insurance company.

34. As relevant to this case and the Plan, in a self-funded plan, the employer pays its enrollees' covered claims directly out of general corporate funds. An employer offering and managing a self-funded plan determines the scope of coverage and benefits to offer, pays medical claims, sets an employee's contribution limits, and assumes the risk of participant healthcare expenses.

35. Health insurance costs for participants are commonly divided into four categories: payroll contributions (in the form of premiums), deductibles, copays, and coinsurance.

36. Participants pay for coverage through payroll contributions. They must also pay certain healthcare costs themselves through deductibles (i.e., the amount a participant must pay before a plan begins paying for most services), copays (i.e., a dollar amount paid for a particular healthcare service in addition to the covered amount), and coinsurance (i.e., a percentage of

---

[4] *See Employer Health Benefits: 2024 Annual Survey,* KFF, available at https://files.kff.org/attachment/Employer-Health-Benefits-Survey-2024-Annual-Survey.pdf, at 64, archived at https://perma.cc/68QJ-4NEC.

[5] *Id.* at 68.

healthcare costs paid by the participant) until the participant reaches the out-of-pocket maximum (i.e., the maximum amount a participant may pay for medical treatment during a year), after which the plan generally pays all covered costs for the remainder of the year.

37. Even when a third-party processes claims, a self-funded employer remains responsible for selecting the health-plan options offered to employees and determining the cost-sharing terms of those options, including payroll contributions, deductibles, and out-of-pocket limits.

38. Employees bear substantial out-of-pocket costs through deductibles, copayments, and coinsurance, with average deductibles for employee-only coverage in employer-sponsored plans exceeding $1,700.[6]

### A. Employers' Selection of Healthcare Options Determines the Costs Employees Bear

39. Employer-sponsored self-funded medical coverage is generally offered through ERISA "employee welfare benefit plans," including plans established or maintained by an employer to provide medical, surgical, or hospital benefits. 29 U.S.C. § 1002(1).

40. Employers may select and offer different healthcare options within a welfare benefit plan, including health maintenance organizations ("HMOs"), preferred provider organizations ("PPOs"), point-of-service plans ("POS Plans"), exclusive provider organizations ("EPOs"), and high-deductible options, each of which structures provider access and cost-sharing between employees and employers differently.

[6] *See Employer Health Benefits: 2023 Annual Survey*, KFF, at 6, available at https://files.kff.org/attachment/Employer-Health-Benefits-Survey-2023-Annual-Survey.pdf, archived at https://perma.cc/BFP4-GVQB.

41. HMOs usually limit coverage to specific doctors and hospitals that contract with the HMO, generally do not cover out-of-network care (other than emergency care), and may require a participant to live or work in a particular service area.[7]

42. By contrast, PPOs generally allow participants to use both in-network and out-of-network providers; however, participants usually pay less when they stay in-network and pay more when they receive out-of-network care.[8]

43. Participants in different plan options pay different amounts for healthcare coverage, and plans may differ significantly in premiums, deductibles, copayments, and coinsurance.[9]

44. Employer-sponsored plans commonly select and offer multiple coverage options that differ in various ways, including with respect to payroll contributions, deductibles, and out-of-pocket limits.[10]

45. These options are typically presented as offering tradeoffs between higher payroll contributions with lower cost-sharing, on the one hand, and lower payroll contributions with higher cost-sharing exposure on the other.[11]

46. Under ERISA, because employers choose plan healthcare options, employers are fiduciaries responsible for ensuring that all options are reasonable and do not needlessly require

---

[7] *See Glossary: Health Maintenance Organization (HMO)*, HEALTHCARE.GOV, available at https://www.healthcare.gov/glossary/health-maintenance-organization-hmo/, archived at https://perma.cc/W9UB-DY7A (defining HMOs as network-restricted plans).

[8] *See Glossary: Preferred Provider Organization (PPO)*, HEALTHCARE.GOV, available at https://www.healthcare.gov/glossary/preferred-provider-organization-ppo/, archived at https://perma.cc/Z3GK-WEH6 (describing broader provider access with differential cost-sharing).

[9] *See generally* Gary Claxton, Matthew Rae & Aubrey Winger, *Health Policy 101: Employer-Sponsored Health Insurance 101*, KFF (Apr. 15, 2026), available at https://www.kff.org/health-costs/health-policy-101-employer-sponsored-health-insurance, archived at https://perma.cc/B83A-2BMN.

[10] *See id.*

[11] *See id.*

participants to pay excessive costs for healthcare.[12] In addition, these fiduciaries are required to monitor those selections ensuring that they remain reasonable. That monitoring must happen at least annually, when the employer-fiduciary assesses the plan's healthcare options and their terms and conditions prior to open enrollment for the following plan year.

47. It is especially important for employers, as diligent and prudent fiduciaries, to select reasonable healthcare options because employees may lack the resources, data, and/or ability to evaluate healthcare options.[13]

**B. Financially Dominated Healthcare Options**

48. Empirical research shows that, when presented with the choice, employees frequently select healthcare options that cost more overall despite the availability of lower-cost options.[14]

49. A "dominated" health plan option is one that costs more, for the same coverage, than another available option regardless of how much a participant spends on healthcare.[15] In other words, a "dominated" option is one that requires a participant to pay more money for the same coverage than the participant would have paid if he or she had selected another available option. For such options, participants incur higher total healthcare costs regardless of how much they spend on healthcare.[16]

---

[12] *See id.*

[13] *See* Saurabh Bhargava, George Loewenstein & Justin Sydnor, *Do Individuals Make Sensible Health Insurance Decisions? Evidence from a Menu with Dominated Options*, National Bureau of Economic Research, Working Paper No. 21160 (May 2015), at 4 ("most subjects lacked definitional and conceptual understanding of insurance concepts such as a deductible and copayment, and these deficits in insurance literacy predicted poor plan choices").

[14] *See id.* at 2 ("[T]he majority of employees chose plans that were financially dominated"), available at https://www.nber.org/system/files/working_papers/w21160/w21160.pdf, archived at https://perma.cc/6CC5-5FP8.

[15] *Id.*

[16] *See* Chenyuan Liu & Justin R. Sydnor, *Dominated Options in Health Insurance Plans*, National Bureau of Economic Research, Working Paper No. 24392 (Mar. 2018), at 4–5,

50. Likewise, a dominated option may be economically inferior in the overwhelming majority of foreseeable utilization scenarios, even if rare and unusual combinations of medical spending can favor the more expensive option. As relevant here, the Traditional PPO was economically inferior to the HIP PPO in the overwhelming majority of spending scenarios.

51. Plan participants frequently select a more expensive option even when another available option would provide the same or better financial value. In one study of nearly 24,000 employees who were offered a selection of health-plan options, a majority (61%) selected "dominated" options.[17] The study concluded that such choices could not be explained by participants' risk preferences or expectations regarding their future healthcare needs.[18]

52. ERISA puts the responsibility for prudent option selection on fiduciaries, not on participants.[19] Participants often lack the information, time, and/or technical ability to accurately analyze plan options. Plan sponsors and fiduciaries like Defendants, by contrast, possess the plan documents, data, claims experience, and modeling tools to evaluate whether options provide value to participants.[20]

---

available at https://www.nber.org/system/files/working_papers/w24392/w24392.pdf, archived at https://perma.cc/5RYX-LBSS.

[17] Saurabh Bhargava, George Loewenstein & Justin Sydnor, *Choose to Lose: Health Plan Choices from a Menu with Dominated Options*, 132 Q.J. Econ. 1319, 1321–23 (2017), available at https://www.cmu.edu/dietrich/sds/docs/loewenstein/ChoseLose.pdf, archived at https://perma.cc/7YF4-6HWB.

[18] *Id.*

[19] *See also* Kate Ho, Joseph Hogan & Fiona Scott Morton, *The Impact of Consumer Inattention on Insurer Pricing in the Medicare Part D Program*, NATIONAL BUREAU OF ECONOMIC RESEARCH, Working Paper No. 21028 (Mar. 2015), at 2, 29 ("even attentive consumers do not make cost-minimizing choices"), available at https://www.nber.org/system/files/working_papers/w21028/revisions/w21028.rev0.pdf, archived at https://perma.cc/P8W3-3CQC.

[20] *See* Peter A. Ubel, David Comerford & Eric Johnson, *Healthcare.gov 3.0—Behavioral Economics and Insurance Exchanges*, 372 N. ENGL. J. MED. 695, 697–98 (Feb. 19, 2015), available at https://business.columbia.edu/sites/default/files-efs/pubfiles/12765/Johnson_healthcare.gov.pdf, archived at https://perma.cc/PQG6-Z584.

53. In evaluating plan options, employers can, and should, analyze a range of potential healthcare spending scenarios, including scenarios in which participants spend little on healthcare and scenarios in which participants spend significant amounts on healthcare.[21]

**C. The Abbott Laboratories Health Care Plan**

54. The Abbott Laboratories Health Care Plan is an "employee welfare benefit plan" within the meaning of 29 U.S.C. § 1002(1).

55. The Plan provides welfare and other benefits for eligible personnel and retirees of Abbott as part of their overall compensation. The Plan's EIN is 36-0698440.

56. The Plan is self-funded through a combination of employer contributions and employee payroll deductions. Abbott retains both BCBS and UHC as third-party administrators but bears the underlying medical-claims risk. Participant premium contributions are paid into and held by Defendants as part of their general assets. Accordingly, Abbott—not an insurer—funds claims and controls the Plan's benefit options, including premiums, deductibles, coinsurance, and out-of-pocket limits.

57. Because the Plan is self-funded, state insurance mandates generally do not regulate the Plan as insurance; ERISA governs it under a federal framework. *See* 29 U.S.C. § 1144(a),

[21] Amy B. Monahan & Barak D. Richman, *Hiding in Plain Sight: ERISA's Cure for the $1.4 Trillion Health Benefits Market*, 42 YALE J. ON REG. 234 (2024), available at https://www.yalejreg.com/wp-content/uploads/04.-Monahan-Richman-Article.-Print.pdf, archived at https://perma.cc/A26X-ZBTG (ERISA's duty of prudence applies to employer health-plan design and urging a data-driven fiduciary process for evaluating health plan options); *Dept. of Labor Field Assistance Bulletin No. 2002-03, Disclosure and other Obligations Related to "Float,"* U.S. DEP'T OF LABOR (Nov. 5, 2002), available at https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2002-03, archived at https://perma.cc/BDH2-Q7VK (ERISA fiduciaries should employ an objective process to obtain and evaluate information necessary to make prudent fiduciary decisions).

(b)(2)(B). Amounts withheld from employee wages for contribution to the Plan become Plan assets. *See* 29 C.F.R. § 2510.3-102(a)(1); *Whiting*, 471 F.3d at 799.

58. During the relevant class period, Defendants offered Plan participants both the Traditional PPO and the HIP PPO.

59. Both the Traditional PPO and the HIP PPO provided the same in-network coverage (that is, the same medical care with the same medical providers), using either the same BCBS PPO network or the same UHC PPO network. The Traditional PPO was Abbott's low-deductible option; the HIP PPO was the high-deductible option. The material differences between the two options were: (i) the deductible, (ii) the premium cost to the participant, and (iii) employer-funded HSA contributions, which were paid only to HIP PPO enrollees.[22]

60. For the 2024 Plan Year, the Plan's principal terms for the two options were as follows:

[22] Employer contributions are available only to participants who, after enrolling in the HIP PPO, open an HSA. Opening an HSA requires compliance with the customer identification procedures required by the Patriot Act, 31 U.S.C. § 5318(l), and its implementing regulations. As a result, some participants enrolled in the HIP PPO may not have opened an HSA and therefore may not receive employer contributions.

| | HIP | Traditional |
|---|---|---|
| Annual Deductible | | |
| Individual | $1,750 | $200 |
| Family | $3,500 | $400 |
| Annual Medical Out-of-Pocket Maximum | | |
| Individual | $4,800 | $3,600 |
| Family | $9,600 | $8,200 |
| Annual Employee Premium Contribution | | |
| Employee Only | $300 | $1,764 |
| Employee+Spouse | $600 | $4,006 |
| Employee+Child(ren) | $300 | $3,253 |
| Employee+Family | $600 | $5,282 |
| Employer HSA Seed Funding | | |
| Individual | **$200** | N/A |
| Family | **$400** | N/A |

*Figure 1*[23]

61. As shown in the figure above, based on Abbott's published 2024 rate sheet, the annual differential in premium contributions between the Traditional PPO and the HIP PPO was significant at every coverage tier, ranging from $1,464 for the Employee Only tier to more than $4,600 for the Employee + Family tier. This difference is even greater when accounting for the additional value of Abbott's HSA contributions, which Abbott provided only to plan participants enrolled in the HIP PPO.[24]

---

[23] Abbott Laboratories Health Care Plan, Plan Document and Summary Plan Description, at 8, 16 (effective Jan. 1, 2024), available at https://cache.hacontent.com/ybr/R516/00472_ybr_ybrfndt/downloads/BCBSActiveSPD.pdf, archived at https://perma.cc/HD38-LHM8 ("2024 Summary Plan Description"); *Abbott Employee Benefits Highlights 2024*, ABBOTT LABS., at 3, https://cache.hacontent.com/ybr/R516/00472_ybr_ybrfndt/downloads/AbbottBenefitHighlightsGuide.pdf, archived at https://perma.cc/5NHY-GPZ9.

[24] An HSA is a tax-advantaged account that participants may use to pay qualified healthcare expenses. HSA accounts are available to participants enrolled in the HIP PPO but not to participants enrolled in the Traditional PPO. For participants enrolled in the HIP PPO who open an HSA account, Defendants annually contribute funds to the account, which are commonly referred to as "seed" money. That contribution reduces the participant's cost of healthcare. A

62. A participant enrolled in the Traditional PPO for the 2024 Plan year paid more than a participant enrolled in the HIP PPO, regardless of coverage tier, as demonstrated by Figures 2–5 below, which compare total participant costs under each plan option at every level of in-network spending:[25]




*Figure 2*

participant receiving a $200 HSA contribution, for example, begins the year with $200 of employer-provided funds available for healthcare expenses. The Traditional PPO provides no comparable employer contribution.

[25] While generative modeling (e.g., computer modeling including scenarios that are extremely rare or unlikely) might be able to isolate atypical scenarios that deviate from the rule, on information and belief, the empirical impact of these outliers is *de minimis*.




*Figure 3*




*Figure 4*




*Figure 5*

63. As the above figures show, the Traditional PPO is more expensive than the HIP PPO under every possible in-network spending scenario. Although the Traditional PPO carries a lower deductible and lower out-of-pocket maximum, those features do not make up for its significantly higher premiums, which make the Traditional PPO more expensive at every level of in-network medical spending across all coverage tiers.

64. As reflected in the Plan's 2024 summary plan description, the Traditional PPO and HIP PPO provide coverage for the same medical services and prescription drugs, including hospital care, physician services, emergency services, diagnostic testing, therapy services, maternity care, preventive care, telemedicine, and infertility treatment, as well as retail, mail-order, and specialty prescription drugs. Under both options, after the annual deductible is met, the Plan

pays 80% of in-network costs and 60% of out-of-network costs.[26] The options are, in short, the same product sold at different price points. Although there are minor differences between the cost-sharing mechanisms in the two plans, none of these mechanisms rescue the Traditional PPO from being dominated by the HIP PPO.

65. Abbott's published 2026 Plan terms confirm the same pattern. For the 2026 Plan Year, both options provided access to "the same" network and "the same" services, and Abbott identified the only difference as being "in how, what and when [participants] pay for coverage."[27] The 2026 annual employee payroll contributions were as follows:

## COMPARE THE PLANS

The national plans have the same great network and quality services. But there's a difference in how – and how much – you pay for coverage.

## ANNUAL EMPLOYEE PAYROLL CONTRIBUTIONS

2026

| | HIP PPO | Traditional PPO | Surest |
|---|---|---|---|
| **Employee*** | $300 | $1,926 | $1,532 |
| **Employee + Spouse/Domestic Partner*** | $1,140 | $4,374 | $3,279 |
| **Employee + Child(ren)*** | $600 | $3,552 | $3,000 |
| **Employee + Family*** | $1,200 | $5,768 | $4,546 |

*Figure 6*[28]

---

[26] *See* 2024 Summary Plan Description at 2, n. 23, *supra*.

[27] *Medical Plans Overview*, ABBOTT LABS., (last accessed June 18, 2026), https://abbottbenefits.com/benefit/medical/, archived at https://perma.cc/BL9N-SRHP.

[28] *Id.*

66. As shown in Figure 6, in 2026, the HIP PPO and Traditional PPO required materially different employee payroll contributions across every type of coverage offered. For example, for employee-only coverage, a participant's annual contribution was $300 for the HIP PPO and $1,926 for the Traditional PPO.[29]

67. Thus, for every type of coverage, the Traditional PPO required substantially higher employee payroll contributions than the HIP PPO for access to "the same" network of providers and services.

68. The Traditional PPO was likewise more expensive than the HIP PPO for employees selecting "Employee + Children" coverage in 2026: at approximately $10,000 in in-network medical spending, for example, a participant in the Traditional PPO would pay roughly $6,184 in total costs, compared to approximately $5,402 under the HIP PPO Plan. At approximately $25,000 in in-network medical spending, the Traditional PPO would cost the participant approximately $9,169, while the HIP PPO Plan would cost the participant approximately $8,406.

69. Likewise, in 2026, the Traditional PPO was also more expensive than the HIP PPO for the "Employee + Spouse/Domestic Partner" coverage tier; and the Traditional PPO was more expensive for the overwhelming majority of spending scenarios as compared to the HIP PPO in the "Family" coverage tier.

70. Thus, over multiple years, the Traditional PPO was virtually always more expensive than the HIP PPO across coverage tiers. Participants enrolled in the Traditional PPO paid more for the same coverage and access to care than participants in the HIP PPO.

[29] *Id.*

71. Defendants nevertheless continued offering the Traditional PPO as a purportedly reasonable option without adequately disclosing that participants choosing that option would pay more than necessary, regardless of their level of medical spending.

**D. Differences Between the Traditional PPO and the HIP PPO**

72. None of the facial differences between the Traditional PPO and HIP PPO change this analysis. These include differences between the Traditional PPO and HIP PPO related to high levels of pharmaceutical spending, co-pay and co-insurance schemes, and the Traditional PPO's lower out-of-network deductibles.

1. *Pharmaceutical Spending and Co-Pay and Co-Insurance Schemes*

73. The Traditional PPO was generally even more expensive for participants who purchased prescription drugs because it treated prescription drugs separately from other medical expenses, requiring participants to satisfy an additional deductible and an additional out-of-pocket maximum for prescription-drug coverage.[30]

74. For example, under Defendants' 2024 employee-only terms, the HIP PPO imposed a combined medical and prescription-drug out-of-pocket maximum of $4,800. By contrast, the Traditional PPO imposed a $3,600 in-network medical out-of-pocket maximum and a separate $1,750 prescription-drug out-of-pocket maximum. A Traditional PPO participant who incurred covered medical and prescription-drug expenses could therefore incur up to $5,350 in combined out-of-pocket costs, compared with the HIP PPO's $4,800 out-of-pocket maximum.

75. In addition, the Traditional PPO required co-pays in amounts of $25 or $50 for office visits before and after hitting the deductible. By contrast, the HIP PPO charged co-insurance for office visits in the amount of 20% after deductible.[31] This difference further demonstrates the

---

[30] 2024 Summary Plan Description at 15, 24, n. 23, *supra*.
[31] *See generally id.*

advantages of the HIP PPO, because 20% of the cost of most office visits is typically lower than the corresponding co-pay amount.[32] Prior to the deductible, the copays in the Traditional PPO do not reverse the cost savings from the HIP PPO even in extreme scenarios. For example, a participant with family coverage who incurs $3,500 in specialist visits and no other medical or pharmacy spending would just meet the deductible in the HIP PPO. If enrolled in the Traditional PPO, they would pay approximately $1,000 in copays. But such a participant would pay $4,682 in higher employee contributions in the Traditional PPO, exceeding the difference in out-of-pocket costs.

2. *Out-of-Network Services*

76. As set forth above, the Traditional PPO was more expensive at every level of in-network spending. As a result, it was more expensive for virtually all Plan participants, including those who utilized out-of-network services.

77. For nearly all health insurance consumers, in-network services constitute the overwhelming majority of services utilized. National healthcare claims data confirm that nearly all medical treatment obtained through employer-sponsored health plans occurs within provider networks. A Kaiser Family Foundation analysis of nearly 20 million individuals covered by large-employer health plans found that only 7.7% of outpatient service days and approximately 18% of inpatient admissions involved even a single claim from an out-of-network provider.[33]

---

[32] The 2023 Health Care Cost and Utilization Report produced by the Health Care Cost Institute lists an average price of $142 for a primary care visit and $162 for specialist visits (available at https://healthcostinstitute.org/wp-content/uploads/2026/10/HCCI-HCCUR-2023.pdf, Figure 28).

[33] Gary Claxton et al., *An Analysis of Out-of-Network Claims in Large Employer Health Plans*, Peterson-KFF Health Sys. Tracker (Aug. 13, 2018), [https://www.healthsystemtracker.org/brief/an-analysis-of-out-of-network-claims-in-large-employer-health-plans/](https://www.healthsystemtracker.org/brief/an-analysis-of-out-of-

78. Like physical health care, mental health care predominantly occurs in-network. In a February 2025 study examining office-based mental health services covered by employer-sponsored insurance between 2018 and 2022, the Health Care Cost Institute found that more than 90% of such claims were billed in-network in every year examined, including 92.4% in 2022.[34]

79. Abbott insureds were even more likely to utilize exclusively in-network services for medical and health services than other insureds because Abbott's self-funded plans operate on two of the largest provider networks in the United States: UnitedHealthcare and Blue Cross Blue Shield. Blue Cross Blue Shield contracts with 95% of U.S. hospitals and 91% of physicians.[35] Similarly, UnitedHealthcare supports more than 1.3 million U.S. providers and 6,700 hospitals, offering one of the largest healthcare networks in the country.[36]

80. Moreover, beginning on January 1, 2022, the federal No Surprises Act limited the circumstances in which participants in employer-sponsored group health plans could be subjected to out-of-network cost sharing. The statute requires emergency services furnished by nonparticipating providers or emergency facilities to be covered subject to in-network cost-sharing requirements. Similar protections extend to specified non-emergency services furnished by out-of-network providers at participating healthcare facilities, absent an applicable exception. *See* 29

network-claims-in-large-employer-health-plans/) (analyzing 2016 claims data involving approximately 20 million individuals covered by large-employer plans).

[34] Bianca Silva Gordon et al., *Mental Health Service Use Among People with Employer-Sponsored Insurance 1–3* (Health Care Cost Inst. & West Health Feb. 2025), https://healthcostinstitute.org/wp-content/uploads/images/pdfs/WH_HCCI_Mental_Health_Brief_22025.pdf (finding that 92.4% of office-based mental-health claims processed through employer-sponsored insurance in 2022 were billed in-network).

[35] Blue Cross Blue Shield Association. (2025, December). *Advancing affordable and equitable health care for everyone* [Fact sheet]. https://www.bcbs.com/media/pdf/Blue-Fact-Sheet.pdf

[36] Steven Shapiro, *UnitedHealthcare Health Insurance Review*, HealthCare Insider (July 10, 2026), https://healthcareinsider.com/unitedhealthcare-health-insurance-review.

U.S.C. § 1185e(a)–(b).[37] Consequently, a participant's receipt of treatment from an out-of-network provider does not always trigger the out-of-network deductible, coinsurance, or out-of-pocket maximum.

81. But even for insureds who did receive meaningful out-of-network care, the HIP PPO was economically advantageous for virtually all Plan participants, and the spending combinations in which the Traditional PPO costs less than the HIP PPO were extremely limited. For example, for Plan participants covering family members, the Traditional PPO was more expensive except in atypical, and unusually high-percentage, extremely high-cost out-of-network spend scenarios. And even in the rare cases involving high levels of out-of-network spending where the Traditional PPO may not always be more expensive, the amount of any savings between the Traditional PPO and the HIP PPO is generally significantly smaller than the amount of added costs between the Traditional PPO and the HIP PPO in the substantial majority of more common spending scenarios.

82. Under Defendants' 2024 employee-only terms, a Plan participant who selected the HIP PPO and incurred $2,500 in covered out-of-network medical expenses would incur $2,800 in total costs, including the $2,500 in expenses and a $300 payroll contribution, before accounting for the $200 employer HSA contribution—or $2,600 in total costs including that contribution. Under the Traditional PPO, the same participant would incur $3,124 in total costs, consisting of $1,764 in annual payroll contributions, a $600 deductible, and 40% coinsurance on the remaining $1,900 in medical expenses.

[37] *See* 29 U.S.C. § 1185e(a)(1)(C), (b)(1)(A), (E) (2024) (restricting out-of-network cost sharing for emergency services and non-emergency services furnished by nonparticipating providers at participating facilities); Requirements Related to Surprise Billing; Part I, 86 Fed. Reg. 36,872, 36,878–81 (July 13, 2021) (establishing implementing requirements for plan years beginning on or after January 1, 2022).

83. A comparison of the Traditional PPO and HIP PPO that accounts for both in-network medical spending and uncommon out-of-network medical spending confirms that the Traditional PPO was economically inferior across virtually all medical spending scenarios. For example, assuming $500 in annual in-network medical spending, an employee enrolled in employee-only coverage would have to incur approximately $2,975 in covered out-of-network medical expenses before the Traditional PPO became as economical as the HIP PPO.

84. At that same level of in-network spending, the HIP PPO remained less expensive for participants enrolled in Employee Plus Children, Employee Plus Spouse, and Family coverage, even when accounting for differences in out-of-network cost sharing.

85. Even assuming $5,000 in annual in-network medical spending, the Traditional PPO broke even with the HIP PPO only in rare circumstances—i.e., after approximately $3,355 in out-of-network spending for Employee Plus Children coverage, $3,660 for Employee Plus Spouse coverage, and $5,790 for Family coverage. This demonstrates that the Traditional PPO's lower out-of-network deductible did not, standing alone, provide a financial advantage to even the substantial majority of participants who received out-of-network treatment.

86. Finally, to the extent that highly unusual medical spending circumstances may have rendered the Traditional PPO less expensive for a participant than the HIP PPO in a single year, it still would nevertheless be a virtual certainty that the participant would have realized savings over the course of the class period by selecting the HIP PPO. This is because empirical research demonstrates that plan choice is sticky, and participants almost always stay with a health plan option for multiple years after selection.[38] Thus, participants who selected the Traditional PPO and

[38] *See, e.g.,* Benjamin R. Handel, *Adverse Selection and Inertia in Health Insurance Markets: When Nudging Hurts*, AM. ECON. REV. 2013, 103(7): 2643–2682, available at http://dx.doi.org/10.1257/aer.103.7.2643.

experienced an uncommon medical spend distribution in a single year very likely saw any savings in that year offset by losses in other years during the class period.

87. In sum, the Traditional PPO cost participants more than the HIP PPO at virtually every level of medical spending despite offering access to the same medical care and services. No prudent fiduciary would maintain an option that is virtually always worse for participants.

88. The greater Traditional PPO contributions made by participants reduce Defendants' cost of funding the Plan, because a greater share of the Plan's costs are shifted to participants.

## DEFENDANTS' VIOLATIONS OF ERISA

### I. ERISA's Statutory Framework and U.S. Department of Labor Guidance

89. ERISA is a "comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983). The term "plan" means "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both[.]" 29 U.S.C. § 1002(3). An employee welfare benefit plan includes "any plan, fund, or program . . . established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, . . . medical, surgical, or hospital care or benefits[.]" 29 U.S.C. § 1002(1).

90. If an employer chooses to provide a healthcare plan to its employees, ERISA imposes "various uniform standards, including rules concerning reporting, disclosure, and fiduciary responsibility[.]" *Shaw*, 463 U.S. at 91.

91. Plan fiduciaries must manage plan assets under a "prudent man standard of care," that is, "solely in the interest of the participants and beneficiaries," and "with the care, skill, prudence, and diligence . . . that a prudent man acting in a like capacity and familiar with such matters would use" under the circumstances. 29 U.S.C. § 1104(a)(1),(a)(1)(B). Plan assets include

the premiums deducted from employee paychecks in exchange for healthcare benefits. *Whiting*, 471 F.3d at 799; *Chelf v. Prudential Ins. Co. of Am.*, 31 F.4th 459, 467 (6th Cir. 2022).

92. The U.S. Department of Labor ("DOL") has issued guidance clarifying that a fiduciary selecting a health-care arrangement must use an "objective" process designed to obtain the information necessary to evaluate the provider's qualifications, the quality of the services offered, and "the reasonableness of the fees charged in light of the services provided."[39]

93. The DOL has further explained that the fiduciary's process must be structured to avoid "self-dealing, conflicts of interest or other improper influence," and that, regardless of the method used, the fiduciary "must be able to demonstrate compliance with ERISA's fiduciary standards."[40]

94. The DOL's guidance does not require a fiduciary to only search for the lowest price. Rather, the DOL recognizes that fiduciaries may consider multiple factors, but still must ensure that the compensation paid is *reasonable* in light of what its participants receive.[41]

95. Under the DOL's guidance, "quality of services" is a relevant fiduciary consideration, and the DOL has identified measures that a fiduciary may evaluate, including the scope and qualifications of available medical providers and specialists, ease of access to providers, ease of access to operational information, the timeliness of internal procedures for handling patient questions and complaints, the confidentiality of patient records, enrollee satisfaction statistics, and accreditation or ratings from independent entities or state agencies.

---

[39] Information Letter 02-19-1998 to Diana O. Ceresi, U.S. DEP'T OF LABOR, (Feb. 19, 1998), available at https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/information-letters/02-19-1998, archived at https://perma.cc/ML37-8D3F; see also 29 U.S.C. § 1104(a)(1)(B).

[40] *Id.*

[41] *Id.*

96. Additional DOL guidance repeats the same principle in the group-health-plan context: fiduciaries must act prudently, must act *solely* in the interest of participants and beneficiaries, and may pay only reasonable plan expenses.[42] The DOL has further explained that prudence is "one of a fiduciary's central responsibilities," that prudence "focuses on the process for making fiduciary decisions," and that fiduciaries therefore should document both their decisions and the basis for them.[43]

97. The DOL's guidance also provides that, even where an employer uses outside professionals or internal committees, the employer remains responsible for the fiduciary functions it performs, including the prudent selection and monitoring of service providers and other arrangements affecting the plan. Likewise, the DOL has advised that fiduciaries should establish and follow a formal review process at reasonable intervals to determine whether existing arrangements should be continued or replaced.[44]

98. Based on the DOL's guidance interpreting ERISA's statutory requirements, therefore, a fiduciary must do more than offer participants a menu of options. A fiduciary must employ a prudent process that (i) tests whether participant costs are reasonable in relation to the value of the benefits offered by an option, (ii) monitors whether costs associated with an option remain reasonable over time, and (iii) removes options that impose participant costs that are excessive in relation to the value they provide.

---

[42] *Understanding Your Fiduciary Responsibilities Under a Group Health Plan*, U.S. DEP'T OF LABOR (2023), available at https://www.dol.gov/node/63394, archived at https://perma.cc/8KVV-TLR2.

[43] *Id.*

[44] Meeting Your Fiduciary Responsibilities, U.S. DEP'T OF LABOR (Sept. 2021), at 6, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities-booklet-2021.pdf, archived at https://perma.cc/7E4N-3THY.

99. Under 29 U.S.C. § 1109(a), a fiduciary who breaches its duties "shall be personally liable to make good to such plan any losses to the plan resulting from each such breach," to restore to the plan any profits made through use of plan assets, and to "such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary." 29 U.S.C. § 1132(a)(2) enables participants and beneficiaries to bring civil actions to seek relief under § 1109, and § 1132(a)(3) authorizes suits for injunctive and other appropriate equitable relief.

## II. ERISA's Fiduciary Duties

100. As described above, Defendants' management of the Plan's health insurance options is governed by ERISA's fiduciary duties of loyalty and prudence. *See* 29 U.S.C. § 1104(a)(1)(A)–(B). These duties require fiduciaries to act "solely in the interest of the participants and beneficiaries" (i.e., duty of loyalty) and with the "care, skill, prudence, and diligence" of a prudent fiduciary in similar circumstances (i.e., duty of prudence). *Id.*

101. Many courts, including the Seventh Circuit, have described ERISA's fiduciary duties as "the highest known to the law." *Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan by & through Lyon v. Buth*, 99 F.4th 928, 943 (7th Cir. 2024) (citation omitted); *see also Halperin v. Richards*, 7 F.4th 534, 546 (7th Cir. 2021) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)). These duties apply to all aspects of plan administration, including the selection and ongoing management of plan options, and fiduciaries must always act with an "eye single to the interests of the participants and beneficiaries." *Halperin*, 7 F.4th at 546 (citation omitted) (duties should apply to the exclusive purpose of providing benefits to participants).

102. As part of these obligations, ERISA fiduciaries have a duty to ensure that plan offerings are prudent and in the best interests of participants. This includes a continuing duty to monitor plan options and remove or correct those that are imprudent. *Hughes*, 595 U.S. at 175–76;

*Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015). A fiduciary cannot satisfy its duty of prudence by merely offering a menu of options if some of those options are predictably and consistently worse for participants. *Tibble*, 575 U.S. at 530. Offering plan options that are always more expensive than available alternatives – particularly where those options provide no countervailing benefit – falls short of this standard. *Id.*

103. A fiduciary must systematically review the healthcare options it offers at regular intervals and remove imprudent ones, including a materially equivalent healthcare plan that costs employees more than a cheaper available plan:. "If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *See Hughes*, 595 U.S. at 176.

104. Fiduciaries must ensure that costs incurred by participants are reasonable. *See Sweda v. Univ. of Penn.*, 923 F.3d 320, 328 (3d Cir. 2019) ("Fiduciaries must . . . understand and monitor plan expenses."); *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 483 (8th Cir. 2020) (discussing a fiduciary's duty to keep plan expenses under control); *see also* Restatement (Third) of Trusts § 88, cmt. a (A.L.I. 2024) ("Implicit in a trustee's fiduciary duties is a duty to be cost-conscious."). "Wasting beneficiaries' money is imprudent." *Hughes v. Northwestern Univ.*, 63 F.4th 615, 627 (7th Cir. 2023) (citation omitted).

105. Fiduciaries cannot "excuse [their] allegedly imprudent decisions" by "relying on the participants' ultimate choice" of one of the healthcare options. *See Hughes*, 595 U.S. at 176. Nor can fiduciaries use the terms of a plan document to shield itself from the consequences of an imprudent decision or the failure to monitor that decision: "[T]he duty of prudence trumps the instructions of a plan document." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014).

The duty of prudence requires fiduciaries to make sound decisions on behalf of participants, not to rely on participants to correct fiduciary failures. *Hughes*, 595 U.S. at 176.

106. In short, "plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options." *Hughes*, 595 U.S. at 176. If a fiduciary continues to offer an imprudent option, like a materially equivalent healthcare plan that costs employees more than a cheaper available plan, then "they have breached their duty" of prudence. *Id.*

107. ERISA's duty of loyalty "requires a plan fiduciary to 'discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries.'" *Albert v. Oshkosh Corp.*, 47 F.4th 570, 574 (7th Cir. 2022) (quoting 29 U.S.C. § 1104(a)(1)). "The reason for such a strict and exclusive duty of loyalty stems from the unique trust relationship, where a third party is entrusted with a settlor's property to be used for the beneficiary. Under this arrangement, 'neither the transferor nor the beneficiaries are well situated to monitor closely the actions of the trustee.'" *Halperin*, 7 F.4th at 546 (quoting Daniel Fischel & John H. Langbein, *ERISA's Fundamental Contradiction: The Exclusive Benefit Rule,* 55 U. Chi. L. Rev. 1105, 1114 (1988)).

108. In addition, ERISA incorporates a duty to disclose material information, which is a "core of a fiduciary's responsibility, animating the common law of trusts long before the enactment of ERISA." *Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452, 466 (7th Cir. 2010) (citation omitted). "This duty of course includes an obligation not to mislead a plan participant or to misrepresent the terms or administration of an employee benefit plan, including an insurance plan." *Id.* "But the duty is not limited to that negative command. It includes an affirmative obligation to communicate material facts affecting the interests of beneficiaries." *Id.*

109. "'[A] fiduciary has a duty to inform when it knows that silence may be harmful and cannot remain silent if it knows or should know that the beneficiary is laboring under a material misunderstanding of plan benefits,' and '[t]he duty of loyalty requires a fiduciary to disclose any material information that could adversely affect a participant's interests.'" *Id.* (quoting *Kalda v. Sioux Valley Physician, Inc.*, 481 F.3d 639, 644 (8th Cir. 2007)). "Information is material if there is a substantial likelihood that [its] nondisclosure 'would mislead a reasonable [participant] in making an adequately informed decision regarding benefits to which she might be entitled.'" *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 599 (8th Cir. 2009) (quoting *Kalda*, 481 F.3d at 644).

110. This general fiduciary duty to disclose material information stemming from the law of trusts is supplemented by a statutory obligation to provide information in a form "sufficiently accurate and comprehensive to reasonably apprise [] participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a).

## III. ERISA's Fiduciary Duties Apply to Defendants Because They Are Performing Fiduciary Functions

111. Whether ERISA's fiduciary duties apply depends on whether an employer is exercising "fiduciary functions" or "settlor" functions. *Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996). An employer acts as a fiduciary when, as here, it "exercise[s] discretionary authority or control over plan administration or management, exercise[s] authority or control over management or disposition of the plan's assets, dispense[s] investment advice, or make[s] benefit determinations." *Bator v. District Council 4*, 972 F.3d 924, 931 (7th Cir. 2020) (citing 29 U.S.C. § 1002(21)(A); *Brooks v. Pactiv Corp.*, 729 F.3d 758, 765–66 (7th Cir. 2013)).

112. ERISA defines a fiduciary functionally. An employer is a fiduciary "to the extent" it exercises discretionary authority over plan management, administration, or the disposition of

plan assets. 29 U.S.C. § 1002(21)(A). This definition is not limited to named fiduciaries, but turns on conduct: "ERISA, however, defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993) (emphasis in original). A court must look at whether an employer was "performing a fiduciary function when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000) (internal punctuation omitted).

113. Fiduciary functions include, among others, "the common transactions in dealing with a pool of assets: selecting investments, exchanging one instrument or asset for another, and so on." *Johnson v. Georgia-Pacific Corp.*, 19 F.3d 1184, 1189 (7th Cir. 1994). Although the decision to create a benefits plan or offer health insurance may be a settlor function, "actions respecting the *administration* or *management* of plan 'assets' are subject to fiduciary standards." *Akers v. Palmer*, 71 F.3d 226, 230 (6th Cir. 1995).

114. The selection and retention of plan investment or benefit options, once a plan is established, are thus fiduciary acts because they involve discretionary control over plan administration and participant choices. *Allen v. GreatBanc Tr. Co.,* 835 F.3d 670, 678 (7th Cir. 2016) (ERISA fiduciaries must act with "care, skill, prudence, and diligence" when making plan-related decisions affecting participants, including "choosing wise investments and monitoring investments to remove imprudent ones").

115. Here, Defendants exercised discretionary authority in determining which specific healthcare options to offer to participants, how to price those healthcare options, and whether to continue offering them over time. Plaintiffs challenge Defendants' fiduciary conduct in their collection of participant contributions, their monitoring of the economic operation of those options,

and their failure to act upon information demonstrating that a significant share of Plan participants were overpaying for equivalent coverage. Those are ongoing fiduciary judgments.

116. Defendants had an ongoing fiduciary obligation to review that option and remove it if it became imprudent relative to available alternatives.

117. Accordingly, Defendants acted as fiduciaries with respect to the selection, retention, and monitoring of the Plan's healthcare options, and Defendants' conduct is thus subject to ERISA's fiduciary duties of prudence and loyalty.

**IV. Defendants Breached Their Fiduciary Duties to Plan Participants**

118. Defendants violated their fiduciary duties in their administration and implementation of the Plan. Defendants failed to implement a prudent process to assess whether the Traditional PPO option was reasonable in light of the coverage it provided. The more costly Traditional PPO provides no financial or medical benefit to participants when compared to the HIP.

119. Defendants acted imprudently by offering the Traditional PPO, which required higher participant spending without providing a corresponding benefit.

120. A prudent fiduciary would have eliminated or repriced that option rather than continuing to offer participants a more expensive option with no benefit.

121. Defendants knew or should have known that participants who selected the Traditional PPO pay more for the same services that are available under the HIP PPO, and that the Traditional PPO option was therefore an imprudent offering.

122. Defendants knew or should have known the economics of the two PPO options because Defendants exercised discretionary authority over the selection and administration of those options. Plan documents identify Abbott as the Plan Administrator and fiduciary, and

expressly state that "[t]he ***employer*** [Abbott] evaluates the costs of the ***Plan*** based on projected ***Plan*** expenses and determines the amount to be contributed by the employer and the amount to be contributed by the covered ***employees*** [i.e., participants]."[45] In other words, Defendants know the employee paycheck contribution for each option, as well as the deductibles, the coinsurance rates, and the out-of-pocket limits.

123. Defendants had more than enough information to determine whether the Traditional PPO's lower deductible was worth its higher required paycheck contributions. Any reasonable analysis would have shown that the Traditional PPO costs more at zero spending, more at moderate spending, and more at the out-of-pocket maximum.

124. Unlike participants making enrollment decisions, Defendants had access to historical medical claims, enrollment data, and the cost-sharing provisions applicable to both PPO options. Defendants therefore had the information to evaluate the joint distribution of in-network and out-of-network spending among Plan participants. A prudent evaluation would have considered how frequently such combinations occurred among the Plan's actual participants and whether any savings justified retaining the Traditional PPO as an available option.

125. Having that information, Defendants could have removed the Traditional PPO or disclosed that Traditional PPO participants were paying more for the same covered medical treatment and provider access. *See Tibble*, 575 U.S. at 529 ("Under trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones."); *Hughes*, 63 F.4th at 630–31 (prudence inquiry is context-specific and centers on the process). Defendants did neither.

126. In fact, Defendants' own enrollment materials demonstrate that Defendants knew or should have known that the Traditional PPO was more expensive for nearly all Plan participants;

[45] 2024 Summary Plan Description at 2, n. 23, *supra*.

Defendants failed to adequately disclose that fact to Plan participants; and as a result, significant numbers of Plan participants continued to overspend on the Traditional PPO for many years.

127. As early as 2017, when Abbott published its annual benefits guide, Defendants represented to participants that a significant majority of employees (i.e., over 90 percent) would spend less money overall by enrolling in the HIP PPO rather than the Traditional PPO.[46]

128. As indicated in Figure 7 below from the same benefits guide, Defendants were not just offering two PPO options. They had developed tools that projected employees' total expected costs under each option, meaning Defendants knew or had every reason to know that the Traditional PPO option was the more expensive option:

**WHAT'S THE RIGHT PLAN FOR YOU?**

Over 90 percent of Abbott employees would save money if enrolled in the Health Investment Plan. For help deciding which medical plan is the best choice, visit **www.abbottbenefits.com** and try the Health Care Cost Tool. You'll be able to model various health care cost scenarios and review cost and coverage data.

*Figure 7*[47]

129. Despite Defendants' knowledge, Abbott continued to offer this more expensive option to unwitting employees; the employees continued to enroll in the Traditional PPO in high numbers; and those employees continued to be overcharged. As shown in Figure 8 below, Abbott's own 2024 enrollment guide states that only "over half" of its employees were enrolled in the HIP PPO at that point—suggesting that nearly half had remained in the Traditional PPO. Moreover, a substantial minority of Plan participants had enrolled in the Traditional PPO even though Abbott's

---

[46] *Benefits for My Life: Abbott's 2017 Benefits Highlights*, ABBOTT LABS., at 5, https://cache.hacontent.com/ybr/R515/00472_ybr_ybrfndt/downloads/AbbottWhatsChanging.pdf [https://perma.cc/CR8V-8ACB].

[47] *Id.*

guide admitted that "over 95% of employees in the Traditional PPO actually would save money if enrolled in the HIP PPO":

> **Which medical plan is right for you?**
>
> It depends on your needs. Over half of employees are in the HIP PPO, and we've found that over 95% of employees in the Traditional PPO actually would save money if enrolled in the HIP PPO.

*Figure 8*[48]

130. Abbott's 2024 enrollment guide was misleading for at least two reasons. First, Abbott's juxtaposition of the statement that "over half" of its employees were in the *HIP PPO* with its assertion that "over 95% of employees in the *Traditional PPO* actually would save money" obfuscated that virtually all participants in the Abbott Plan—i.e., those enrolled in the HIP PPO and those enrolled in the Traditional PPO—would save money in the HIP PPO. Second, Abbott presented the Traditional PPO as a legitimate, side-by-side choice with the HIP PPO, telling participants that which medical plan was "right" for them "depend[ed]" on their individual "needs," and advised participants to consider, in that context, that "over half" of employees were in the HIP PPO—implying that just under half were enrolled in the Traditional PPO. This presentation falsely suggested that the HIP was the "right" choice for close to half of employees. In any event, these admissions confirm Abbott's knowledge that the Traditional PPO is a vastly inferior option.

131. Abbott's enrollment-guide admissions demonstrate that the imprudent nature of the Traditional PPO was not apparent only through hindsight or expert modeling. Defendants analyzed

---

[48] *Abbott Employee Benefits Highlights 2024*, ABBOTT LABS., at 3, https://cache.hacontent.com/ybr/R516/00472_ybr_ybrfndt/downloads/AbbottBenefitHighlightsGuide.pdf, archived at https://perma.cc/5NHY-GPZ9.

the comparative costs, understood that the HIP PPO option would save money for the overwhelming majority of the Traditional PPO population, and nevertheless continued to offer and present the Traditional PPO as a reasonable alternative to the HIP PPO.[49]

132. Abbott presented the Traditional PPO to participants as a comparable choice dependent on individual "needs," and encouraged Plan participants to compare features such as premiums and deductibles, without disclosing the per-scenario dollar penalty.

133. Additionally, Defendants had years of data demonstrating that the Traditional PPO is more expensive than the HIP PPO.

134. Defendants' use of cost-modeling tools as early as 2017 and representations about employee savings further demonstrate that they knew or should have known of the cost differences between the Traditional PPO and HIP PPO.

135. Moreover, because Abbott's Plan is self-funded, claims are paid from Plan assets. Accordingly, in the ordinary course of operating the Plan, Defendants received and maintained recurring data each year on enrollment, claims, and the costs associated with the Traditional PPO and HIP PPO.

136. Based on these data, Defendants knew or should have known, by the start of the class period in 2020, that the Traditional PPO was more expensive than the HIP PPO. Continuing to offer the higher-cost Traditional PPO under these circumstances was imprudent.

137. A prudent fiduciary would have identified that the Traditional PPO was more expensive than the HIP PPO and taken timely corrective action—i.e., eliminating, redesigning, or

[49] Moreover, Defendants' disclosure would not insulate Defendants from liability even if it were not misleading (and it is), because a fiduciary does not escape liability for a fiduciary breach merely by disclosing the breach.

repricing it, or otherwise taking action to eliminate the significant economic costs that the Traditional PPO imposes on Plan participants. Defendants took none of these steps.

138. Instead, Defendants persisted both in offering the Traditional PPO and presenting the Traditional PPO to Plan participants as a reasonable option. According to Abbott's 2024 Benefits Highlights Guide, an excerpt of which is Figure 9 below, for example, Defendants represented to employees that it offered two PPO "national medical plans" that "mainly differ in how and when you pay for coverage—either at the time of service or through regular paycheck contributions."



MEDICAL PLANS

Abbott offers two national medical plans.* They mainly differ in how and when you pay for coverage—either at the time of service or through regular paycheck contributions.

Each plan has its own network of providers, however, both plans cover the same services and include free preventive care.

HEALTH INVESTMENT PLAN (HIP) PPO

The HIP PPO has low paycheck contributions and a higher deductible. Features include access to more than 1,700 free preventive medications, and a Health Savings Account (HSA) that lets you contribute pre-tax dollars to cover healthcare expenses. Abbott also contributes to your HSA.

TRADITIONAL PPO

With the Traditional PPO, you have higher paycheck contributions, which you'll pay regardless of the amount of medical services you use. This plan includes a lower deductible and out-of-pocket costs.

**Both plans are available with the UnitedHealthcare (UHC) or BlueCross BlueShield (BCBS) network.**

* Regional plans are available in California and Hawaii. For more information, access the Abbott Benefits Center via AbbottBenefits.com or speak to your recruiter.

CARE COORDINATORS

Available to national medical plan participants, the Care Coordinators are an expert team of nurses and benefit specialists who can assist with billing and benefit questions, finding network providers and reducing your out-of-pocket costs. Think of them as your health care "concierge desk," always ready to get you the help you need.

DENTAL

Abbott offers comprehensive coverage for dental expenses including exams, teeth cleaning, fillings, orthodontia and restorative services.

VISION

Abbott vision coverage includes exams, prescription lenses, frames, and contact lenses, plus discounts on certain services.

RETIREE HEALTH INSURANCE

Eligible employees who meet certain age and service requirements at retirement have access to retiree medical and life insurance. Retiree dental coverage is also available through MetLife.

RX SAVINGS SOLUTIONS

Alerts on money-saving opportunities for your prescriptions.

*Figure 9*[50]

139. Defendants described the HIP PPO as having "low paycheck contributions and a higher deductible."[51] Defendants further represented that the HIP PPO included access to more than 1,700 free preventive medications and an HSA to which Abbott itself contributed funds.

[50] *Abbott Employee Benefits Highlights 2024*, ABBOTT LABS., at 3, https://cache.hacontent.com/ybr/R516/00472_ybr_ybrfndt/downloads/AbbottBenefitHighlightsGuide.pdf, archived at https://perma.cc/5NHY-GPZ9.

[51] *Id.*

140. Defendants described the Traditional PPO as requiring "higher paycheck contributions," which participants would pay "regardless of the amount of medical services" they used.[52]

141. Defendants further represented that the Traditional PPO included "a lower deductible and out-of-pocket costs."[53]

142. Defendants' benefits materials thus informed participants that the distinction between the HIP PPO and Traditional PPO was in the allocation and timing of participant costs—not the scope of covered medical services, which Defendants represented were the same under both options.

143. Defendants were aware, or should have been, including based on the data they collected and maintained, that employees selecting the Traditional PPO would virtually always incur higher healthcare costs irrespective of their medical spending.

144. That participants had the opportunity to enroll in either option is no defense: "[P]articipants' ultimate choice" cannot "excuse allegedly imprudent decisions by [Defendants]." *Hughes*, 595 U.S. at 176. "Plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options." *Id.*

## IV. Defendants' Specific Fiduciary Acts and Omissions in Administering the Plan

145. Defendants undertook responsibilities in implementing, managing, administering, and monitoring the Plan. These responsibilities included overseeing the Plan's administration;

---

[52] *Id.*
[53] *Id.*

supervising third-party administrators and other service providers; gathering and evaluating claims, enrollment, and cost information; preparing and approving enrollment materials; maintaining cost comparison tools; and communicating information concerning the Plan's benefits and costs to participants. To the extent Defendants exercised discretionary authority or control in performing these functions, they acted as fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A).

146. In carrying out their fiduciary responsibilities, Defendants failed to exercise the care, skill, prudence, and diligence that a prudent fiduciary familiar with the administration of a large, self-funded employer-sponsored health plan would exercise under similar circumstances. Specifically, Defendants committed one or more of the following acts and omissions, amongst others:

(a) Failing to undertake and take appropriate action based on an annual comparison of the costs participants would incur under the Traditional PPO and HIP PPO, considering employee payroll contributions, deductibles, copayments, coinsurance, out-of-pocket maximums, and available employer HSA contributions;

(b) Failing to evaluate adequately the different treatment of prescription-drug expenses, including the Traditional PPO's separate medical and pharmacy deductibles and out-of-pocket limits, the HIP PPO's combined limits, and the resulting total costs for participants requiring recurring or high-cost medications;

(c) Failing to take corrective administrative action after obtaining information showing that the overwhelming majority of Traditional PPO enrollees would save money under the HIP PPO, including failing to ensure enrollment guidance explained the magnitude of the Traditional PPO's higher costs and the limited circumstances in which its lower cost-sharing requirements could result in participant savings.

(d) Implementing payroll deductions for Traditional PPO enrollees and withholding larger employee contributions from their wages than were required of HIP PPO enrollees for equivalent health coverage;

(e) Collecting and retaining those additional employee contributions in connection with the administration and funding of the self-funded Plan; and

(f) Failing to communicate the comparison of the two PPO options accurately when presenting those options to participants, including failing to explain the magnitude of the Traditional

PPO's additional annual costs and failing to correct misleading characterizations in the Plan's enrollment materials, including statements suggesting that selection between the two PPO options depended upon participants' individual preferences.

147. As a direct and foreseeable result of these acts and omissions, Plaintiffs and other Traditional PPO enrollees paid excess payroll contributions and incurred additional healthcare costs that they otherwise would have avoided.

## CLASS ACTION ALLEGATIONS

148. 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan to seek remedies provided by 29 U.S.C. § 1109(a). In addition, 29 U.S.C. § 1132(a)(3) authorizes any participant or beneficiary of the Plan to bring suit for injunctive or other equitable relief.

149. Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23, individually and on behalf of the following similarly situated individuals (collectively, the "Class"):

> All employees of Abbott Laboratories who, at any time on or after June 10, 2020, through the date of judgment, were enrolled in the Traditional Preferred Provider Organization healthcare option offered under the Abbott Laboratories Health Care Plan, and all beneficiaries covered through those participants. Excluded from the Class are Defendants, their directors and officers, any officers or employees of Defendants with responsibility for the Plan's administrative functions, their immediate family members, and any judicial officer presiding over this action.

150. **Numerosity.** The Class satisfies Fed. R. Civ. P. 23(a)(1) because it comprises thousands of persons, such that joinder of all members is impracticable. On information and belief, the Traditional PPO enrolled a substantial share of Abbott's more than 32,000 Plan participants during the Class period.

151. **Commonality.** This action satisfies Fed. R. Civ. P. 23(a)(2) because it presents numerous common questions of law and fact, as Defendants offered a uniform Plan design and the

same PPO options to all Plan participants. These common questions of law and fact include, but are not limited to: (i) whether Defendants owed Class members fiduciary duties under ERISA, and the scope of those duties; (ii) whether the Traditional PPO was financially dominated by the HIP during the Class period; (iii) whether Defendants' process for selecting, monitoring, and retaining the Traditional PPO was prudent; (iv) whether Defendants knew or should have known that the Traditional PPO was imprudent, i.e., more expensive than the HIP PPO for the same covered medical treatment across coverage tiers and spending levels; (v) whether offering and maintaining an imprudent Traditional PPO breached Defendants' fiduciary duties; (vi) whether Defendants failed to disclose that Traditional PPO participants would pay more for no added benefit, and whether that omission was materially misleading; (vii) whether Defendants failed to monitor their appointed fiduciaries; and (viii) the proper measure of Plan-wide losses and equitable relief. These issues arise from Defendants' centralized conduct and can be resolved on a class-wide basis.

152. **Typicality.** Plaintiffs' claims are typical of Class members' claims. Plaintiffs participated in the Plan, were current or former Abbott employees or beneficiaries, enrolled in the Traditional PPO during the Class period, and were subject to the same medical options as other Class members. Defendants managed the Plan collectively and treated Plaintiffs consistently with other Class members, and Defendants' imprudent actions and omissions affected all Class members similarly.

153. **Adequacy.** Plaintiffs will fairly and adequately represent the interests of the Class under Fed. R. Civ. P. 23(a)(4). Their interests are aligned with the Class, they have no conflicts with other Class members that would impair or impede their ability to represent Class members, they are committed to the vigorous prosecution of this action, and they have retained counsel experienced in complex ERISA fiduciary-breach class action litigation.

154. Plaintiffs' chosen counsel will fairly and adequately represent the interests of the Class. Plaintiffs' counsel are experienced, skilled ERISA and class action attorneys:

- Schlichter Bogard's work in class actions has been covered by numerous national publications, including the *New York Times* and *Wall Street Journal*, among other media outlets. Schlichter Bogard has also been widely recognized by federal judges across the United States as a pioneer in fiduciary breach class action litigation. *E.g.*, *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S. Dist. LEXIS 93206, at *4 (S.D. Ill. July 17, 2015) (Schlichter Bogard is the "pioneer and the leader in the field[.]"). Schlichter Bogard's vast experience in this area is reflected by the firm's appointment as class counsel in 45 ERISA class actions involving claims of fiduciary breaches in large defined contribution and defined benefit plans.[54]
- Zuckerman Spaeder's health insurance disputes practice, and its members, have successfully prosecuted numerous nationwide class actions involving breaches of ERISA fiduciary duties and related claims in the healthcare space.[55] As a result of Zuckerman Spaeder's ERISA experience, the DOL has often filed amicus briefs supporting the plaintiffs or plaintiff classes represented by the firm in ERISA matters.[56]
- Xiao Wang is a law professor at the University of Virginia and Director of the Law School's Supreme Court Litigation Clinic. He also operates Wang Law PLLC. Mr. Wang has extensive experience in complex civil litigation and in ERISA, having previously presented oral argument on behalf of Petitioners before the U.S. Supreme Court in *Cunningham v. Cornell*, 604 U.S. 693 (2025).

155. **Fed. R. Civ. P. 23(b)(1).** Prosecution of separate actions for these breaches of fiduciary duties by individual Plan participants and beneficiaries would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants. In

---

[54] *See, e.g., Berkelhammer v. ADP TotalSource Ret. Grp.*, No. 20-5696, ECF 270 (D.N.J.); *Harmon v. Shell Oil Co.*, No. 20-21, 2025 U.S. Dist. LEXIS 18545; (S.D. Tex.); *Schoen v. ATI, Inc.*, No. 24-01109, ECF 49 (W.D. Pa.); *Khan v. Bd. of Dirs. of Pentegra Defined Contribution Plan*, No. 20-07561, 2023 U.S. Dist. LEXIS 171827 (S.D.N.Y.); *Binder v. PPL Corp.*, No. 22-133, ECF 82 (E.D. Pa.); *Williams v. Centerra Group, LLC*, No. 20-4220, ECF 175 (D. S.C.).

[55] *See, e.g., Collins v. Anthem, Inc.*, No. 20-1969, ECF 140 (E.D.N.Y.); *DeMaria v. Horizon Healthcare Servs., Inc.*, No. 11-7298, ECF 97 & 99 (D.N.J.); *Des Roches v. Cal. Physicians' Service*, No. 16-2848, ECF 271 (N.D. Cal.); *Doe v. Health Care Serv. Corp.*, No. 16-4571, ECF 85 (N.D. Ill.); *In re Cigna-Am. Specialty Health Admin. Fee Litig.*, No. 16-3967, ECF 101 & 102 (E.D. Pa.).

[56] *See, e.g., Wit v. United Behavioral Health*, Nos. 20-17363, 20-15193 (9th Cir.); *Peterson v. UnitedHealth Grp., Inc.*, No. 14-2102 (D. Minn.); *N.Y. State Psychiatric Assoc. v. UnitedHealth Grp.*, 798 F.3d 125 (2d Cir. 2015).

addition, adjudications with respect to individual members would, as a practical matter, be dispositive of the interests of, or substantially impair the ability to protect the interests of, other members. Certification is therefore appropriate under Rule 23(b)(1)(A) and (B).

156. **Fed. R. Civ. P. 23(b)(2).** Additionally, or in the alternative, certification is appropriate under Rule 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive or corresponding declaratory relief is appropriate respecting the Class as a whole, including reformation of the Plan.

157. **Fed. R. Civ. P.23(b)(3).** Additionally, or in the alternative, certification is appropriate under Rule 23(b)(3) because common questions of law and fact predominate over any individual questions, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder is impracticable, individual losses may be small relative to the cost of individual actions, and Plaintiffs are aware of no difficulties likely to be encountered in managing this action as a class action. If individual actions were required to be brought by each member of the Class, the result would be a multiplicity of actions, creating hardship to the Class, to the Court, and to Defendants.

## CAUSES OF ACTION

### COUNT I
### Breach of Fiduciary Duty—
### Selecting and Retaining an Imprudent Option
### (29 U.S.C. § 1104(a)(1)) (On Behalf of Plaintiffs and the Class)

158. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

159. Defendants are or were fiduciaries of the Plan under 29 U.S.C. § 1002(21).

160. ERISA § 404(a) required Defendants to act "with the care, skill, prudence, and diligence" of a prudent fiduciary, solely in participants' interests, when selecting, monitoring, and maintaining the Plan's PPO options. This is a continuing duty that includes evaluating and

monitoring the Plan's healthcare options on an ongoing basis, removing imprudent ones, and ensuring that no option is virtually always inferior to another.

161. Defendants breached these duties by offering and maintaining the Traditional PPO alongside the HIP PPO even though the Traditional PPO consistently produced higher total annual costs across all coverage tiers and all levels of medical spending, while offering the same covered medical treatment and provider access. In other words, participants in the Traditional PPO paid more for the same care. A prudent fiduciary would not offer or retain an option that is worse on cost with no offsetting benefit.

162. Defendants also breached these duties by retaining and offering the Traditional PPO even though the Traditional PPO imposed materially higher participant costs than the HIP PPO without commensurate additional value. Defendants thereby shifted to participants the burden of identifying and avoiding an imprudent option that Defendants had the information and fiduciary obligation to evaluate.

163. Defendants also breached their duty of loyalty by retaining and presenting an option that caused participants to pay excess costs for no commensurate participant benefit. Defendants' conduct was not solely in the interest of participants and beneficiaries.

164. A prudent fiduciary would have identified that the Traditional PPO was imprudent and taken timely action to eliminate, redesign, and/or reprice it. A prudent fiduciary would also have monitored premiums, deductibles, coinsurance rates, and out-of-pocket maximums to ensure that no healthcare option was financially dominated.

165. Defendants' breaches caused significant losses to the Plan and its participants in the form of excess premium contributions, payroll deductions, forgone employer HSA contributions, higher out-of-pocket costs, and lost wages. Each Defendant is liable to restore those

losses and to provide appropriate equitable relief under ERISA. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2)–(3).

**COUNT II**
**Breach of Fiduciary Duty—**
**Failure to Disclose Material Information**
**(29 U.S.C. § 1104(a)(1)) (On Behalf of Plaintiffs and the Class)**

166. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

167. Defendants are or were fiduciaries of the Plan under 29 U.S.C. § 1002(21)(A) and were required to act with prudence and loyalty under 29 U.S.C. § 1104(a)(1), including a duty to disclose material information where silence would mislead participants or cause harm. *See Howell v. Motorola, Inc.*, 633 F.3d 552, 571–72 (7th Cir. 2011); *Kenseth*, 610 F.3d at 466.

168. Defendants breached their duties by failing to disclose—let alone in a clear, prominent, and actionable manner—that the Traditional PPO would cost participants more than the HIP PPO in virtually every utilization scenario, for the same covered medical treatment and provider access.

169. Defendants knew or should have known, including based on their own data, that the Traditional PPO consistently resulted in higher total annual costs across coverage tiers and spending levels. They nonetheless presented the Traditional PPO to participants as a comparable choice dependent on individual "needs," without disclosing its imprudence. Defendants' communication strategy—framing a participant's choice as a matter of individual preference—impaired participants' ability to make informed elections.

170. Defendants' omissions were material because a reasonable participant would view the fact that one healthcare option is more expensive than another healthcare option offering the same benefits as critical to his or her selection.

171. By withholding this information, Defendants caused participants to enroll in and remain in an imprudent option, resulting in excess payroll contributions, higher healthcare costs, and lost wages.

172. As a result of Defendants' breaches, the Plan and its participants suffered significant losses in the form of excessive healthcare expenses, including through payroll deductions and lost wages. Each Defendant is liable to make the Plan whole and to provide appropriate equitable relief under ERISA. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2)–(3).

**COUNT III**
**Breach of Fiduciary Duty—**
**Failure to Monitor and Co-Fiduciary Liability**
**(29 U.S.C. §§ 1104, 1105(a); 29 C.F.R. § 2509.75-8, FR-17)**
**(On Behalf of Plaintiffs and the Class)**

173. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

174. Abbott and/or the Board were the appointing and named fiduciaries for the Plan and had authority to appoint, retain, monitor, and remove the Committee, Abbott's Corporate Benefits Department and its Divisional Vice President of Compensation and Benefits, claims administrators, service providers, and other fiduciaries responsible for administering and monitoring the Plan's medical options.

175. Those appointing fiduciaries had a continuing duty to monitor their appointees at reasonable intervals to ensure they were performing their duties in compliance with ERISA, the Plan documents, and the interests of participants and beneficiaries. *Howell*, 633 F.3d at 573 (those who appoint plan administrators have an ongoing fiduciary duty to monitor the activities of their appointees) (citing 29 C.F.R. § 2509.75-8, FR-17).

176. Defendants breached that duty by failing to establish or follow a process reasonably calculated to assess whether their appointed fiduciaries used a prudent process to evaluate the Traditional PPO, compare it against the HIP PPO, review participant cost data, and correct or

remove an option that imposed materially higher participant costs without corresponding value. Had Defendants prudently monitored their appointees, the Traditional PPO's financial domination would have been identified, discussed, and remedied.

177. Defendants further breached their monitoring duties by failing to remove or replace inadequate fiduciaries, failing to require a prudent review process, and failing to ensure that corrective action was taken, despite years of enrollment, claims, contribution, and cost-modeling data.

178. Each Defendant is also liable as a co-fiduciary under ERISA § 405(a), 29 U.S.C. § 1105(a), for knowingly participating in another fiduciary's breach, for enabling such breach by failing to discharge its own duties, and for failing to make reasonable efforts to remedy known breaches.

179. As a direct result of Defendants' failure to monitor appointed fiduciaries, the Plan and its participants suffered losses. Under 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Defendants are liable to restore to the Plan and its participants all losses resulting from these breaches.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class and the Plan, pray for relief as follows:

**A. Certify this action as a class action under Federal Rule of Civil Procedure 23;**

**B. Designate Plaintiffs as class representatives and their counsel as class counsel;**

**C. Declare that Defendants have breached their fiduciary duties under ERISA;**

**D. Order Defendants to personally make good to the Plan and its participants all losses resulting from the breaches of fiduciary duty described herein, and to**

**restore the Plan and its participants to the position they would have occupied but for this unlawful conduct;**

**E. Grant such other equitable or remedial relief under ERISA as the Court deems appropriate, including (i) surcharge against Defendants for ill-gotten gains; (ii) reformation of the Plan to eliminate or reprice the dominated Traditional PPO option; (iii) disgorgement; (iv) an accounting; and (v) an injunction against continued maintenance of a dominated plan option;**

**F. Enjoin Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;**

**G. Award pre- and post-judgment interest at the maximum lawful rate;**

**H. Award reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common-fund doctrine; and**

**I. Grant such other and further relief as the Court deems just and proper.**

Respectfully submitted,

Dated: October 27, 2026

/s/ Andrew D. Schlichter

ANDREW D. SCHLICHTER
TROY A. DOLES
CHEN KASHER
CORT A. VANOSTRAN
RACHEL A. BERGER
**SCHLICHTER BOGARD LLC**
100 South Fourth Street, Suite 1200
St. Louis, MO 63102
Telephone: (314) 621-6115
aschlichter@uselaws.com
tdoles@uselaws.com
ckasher@uselaws.com
cvanostran@uselaws.com
rberger@uselaws.com

NICHOLAS M. DICARLO (admitted *pro hac vice*)
**ZUCKERMAN SPAEDER LLP**
2100 L Street N.W., Ste. 400
Washington, D.C. 20037
Telephone: (202) 778-1835
ndicarlo@zuckerman.com

JASON S. COWART (admitted *pro hac vice*)
**ZUCKERMAN SPAEDER LLP**
485 Madison Ave., 19th Fl.
New York, NY 10022
Telephone: (212) 704-9600
jcowart@zuckerman.com

AARON S.J. ZELINSKY (admitted *pro hac vice*)
**ZUCKERMAN SPAEDER LLP**
100 E. Pratt Street, Ste. 2440
Baltimore, MD 21202
Telephone: (410) 949-1167
azelinsky@zuckerman.com

XIAO WANG
**WANG LAW PLLC**
8401 Mayland Dr., No. 11276
Richmond, VA 23294
Telephone: (202) 854-8873
xiao@xwanglaw.com

*Counsel for Plaintiffs*