**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

NAPOLEON J. A. EBARLE III, ROBBIN JOHNSON, MICHAEL GULOTTA, and SARA LUNDBORG, individually and as representatives of a class of similarly situated persons, and on behalf of the Abbott Laboratories Health Care Plan,

Plaintiffs,

v.

ABBOTT LABORATORIES, THE BOARD OF DIRECTORS OF ABBOTT LABORATORIES; ABBOTT LABORATORIES EMPLOYEE BENEFITS COMMITTEE; and DOES 1–20,

Defendants.

Case No. 1:26-cv-06834

Hon. John Robert Blakey

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED CLASS ACTION COMPLAINT UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........ 1
FACTUAL BACKGROUND ........ 4
I. THE ABBOTT PLAN ........ 4
II. THE PLAN'S PPO OPTIONS ........ 5
III. ABBOTT'S DISCLOSURES ........ 7
LEGAL STANDARD ........ 7
ARGUMENT ........ 8
I. COUNT I FAILS BECAUSE IT CHALLENGES NON-FIDUCIARY PLAN DESIGN DECISIONS AND DOES NOT PLAUSIBLY ALLEGE THAT NO EMPLOYER COULD REASONABLY OFFER THE TRADITIONAL PPO. ........ 8
A. Count I Does Not State a Claim for Breach of Fiduciary Duty Because It Challenges Non-Fiduciary, Settlor Decisions. ........ 8
i. Abbott's Decisions About What PPO Options to Offer and on What Terms Are Core Settlor Functions. ........ 9
ii. Plaintiffs' Cited Authority Does Not Transform Abbott's Plan-Design Decisions Into Fiduciary Acts. ........ 11
iii. The Actions Plaintiffs Challenge Are Plan-Design Decisions. ........ 13
B. Count I Also Fails Because Offering an Option That Benefits Some Participants Is Not Imprudent. ........ 14
C. To the Extent Plaintiffs Assert a Disloyalty Claim in Count I, It Also Fails. ........ 17
II. COUNT II DOES NOT PLAUSIBLY ALLEGE A BREACH OF THE DUTY TO DISCLOSE PLAN-RELATED INFORMATION TO PARTICIPANTS. ........ 19
A. Abbott Disclosed the Information Required Under ERISA. ........ 19
B. Plaintiffs Do Not Plausibly Allege That Abbott's Communications About the Plan Were Materially Misleading. ........ 21
III. COUNT III IS DERIVATIVE OF PLAINTIFFS' OTHER CLAIMS AND CANNOT SURVIVE ON ITS OWN. ........ 22
IV. PLAINTIFFS' CLAIMS ALSO FAIL AS A MATTER OF LAW TO THE EXTENT THEY ARE BROUGHT UNDER ERISA § 502(A)(2). ........ 23
CONCLUSION ........ 23

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Akers v. Palmer*,
71 F.3d 226 (6th Cir. 1995) ........ 12

*Albert v. Oshkosh Corp.*,
47 F.4th 570 (7th Cir. 2022) ........ 7, 18, 23

*Albert v. Oshkosh Corp.*,
2021 WL 3932029 (E.D. Wis. 2021), *aff'd*, 47 F.4th 570 (7th Cir. 2022) ........ 17

*Allen v. GreatBanc Tr. Co.*,
835 F.3d 670 (7th Cir. 2016) ........ 11

*Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan by & through Lyon v. Buth*,
99 F.4th 928 (7th Cir. 2024) ........ 23

*Argay v. Nat'l Grid USA Serv. Co.*,
503 F. App'x 40 (2d Cir. 2012) ........ 10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 7

*Assocs. in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*,
729 F. Supp. 1162 (N.D. Ill. 1989), *aff'd*, 941 F.2d 561 (7th Cir. 1991) ........ 12

*Baker v. Kingsley*,
387 F.3d 649 (7th Cir. 2004) ........ 20

*Bator v. Dist. Council 4*,
972 F.3d 924 (7th Cir. 2020) ........ 9, 10, 13, 14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 7

*Bland v. Fiatallis N. Am., Inc.*,
401 F.3d 779 (7th Cir. 2005) ........ 9

*Bogie v. Rosenberg*,
705 F.3d 603 (7th Cir. 2013) ........ 7

*Bowerman v. Wal-Mart Stores, Inc.*,
226 F.3d 574 (7th Cir. 2000) ........ 20, 22

*Conkright v. Frommert*,
559 U.S. 506 (2010) ........ 9

*Cortes v. Midway Games, Inc.*,
2004 WL 2367738 (N.D. Ill. 2004) ........ 9

*Coulter v. Morgan Stanley & Co.*,
753 F.3d 361 (2d Cir. 2014) ........ 12

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Curtiss-Wright Corp. v. Schoonejongen*,
514 U.S. 73 (1995)....................................................................................................... 9

*Ehlmann v. Kaiser Found. Health Plan of Tex.*,
198 F.3d 552 (5th Cir. 2000) ....................................................................................... 21

*Fifth Third Bancorp v. Dudenhoeffer*,
573 U.S. 409 (2014)............................................................................................... 12, 13

*Fin. Fiduciaries, LLC v. Gannett Co.*,
46 F.4th 654 (7th Cir. 2022) ......................................................................................... 5

*Forman v. TriHealth, Inc.*,
40 F.4th 443 (6th Cir. 2022) ....................................................................................... 18

*Frahm v. Equitable Life Assurance Soc'y of U.S.*,
137 F.3d 955 (7th Cir. 1998) ....................................................................................... 10

*George v. Kraft Foods Glob., Inc.*,
641 F.3d 786 (7th Cir. 2011) ....................................................................................... 11

*Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*,
465 F.3d 1123 (9th Cir. 2006) ..................................................................................... 23

*Halperin v. Richards*,
7 F.4th 534 (7th Cir. 2021) ........................................................................................... 9

*Hecker v. Deere & Co.*,
496 F. Supp. 2d 967 (W.D. Wis. 2007), *aff'd*, 556 F.3d 575 (7th Cir. 2009)...................... 5, 14

*Howell v. Motorola, Inc.*,
633 F.3d 552 (7th Cir. 2011) ................................................................................. 11, 20

*Hughes Aircraft Co. v. Jacobson*,
525 U.S. 432 (1999)..................................................................................................... 18

*Hughes v. Nw. Univ.*,
595 U.S. 170 (2022)..................................................................................................... 11

*Johnson v. Georgia-Pacific Corp.*,
19 F.3d 1184 (7th Cir. 1994) ....................................................................................... 12

*Kamler v. H/N Telecomm. Servs., Inc.*,
305 F.3d 672 (7th Cir. 2002) ....................................................................................... 21

*Kenseth v. Dean Health Plan, Inc.*,
610 F.3d 452 (7th Cir. 2010) ....................................................................................... 20

*Larson v. United Healthcare Ins. Co.*,
723 F.3d 905 (7th Cir. 2013) ............................................................................. 9, 10, 13

*Leimkuehler v. Am. United Life Ins. Co.*,
713 F.3d 905 (7th Cir. 2013) ....................................................................................... 13

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Lockheed Corp. v. Spink*,
517 U.S. 882 (1996) .......... 9, 18

*Martin v. CareerBuilder, LLC*,
2020 WL 3578022 (N.D. Ill. 2020) .......... 17

*Patterson v. Morgan Stanley*,
2019 WL 4934834 (S.D.N.Y. 2019) .......... 18

*Peabody v. Davis*,
636 F.3d 368 (7th Cir. 2011) .......... 23

*Pegram v. Herdrich*,
530 U.S. 211 (2000) .......... 8, 9, 13

*Senn v. United Dominion Indus., Inc.*,
951 F.2d 806 (7th Cir. 1992) .......... 10

*Smith v. Med. Benefit Adm'rs Grp., Inc.*,
639 F.3d 277 (7th Cir. 2011) .......... 23

*Sprague v. Gen. Motors Corp.*,
133 F.3d 388 (6th Cir. 1998) .......... 21

*Stephanie R. v. Blue Cross & Blue Shield of Ill.*,
815 F. Supp. 3d 809 (N.D. Ill. 2025) .......... 5

*Stern v. JPMorgan Chase & Co.*,
2026 WL 654714 (S.D.N.Y. 2026) .......... 10

*Sullivan v. Cuna Mut. Ins. Soc'y*,
683 F. Supp. 2d 918 (W.D. Wis. 2010) .......... 14

*Tibble v. Edison Int'l*,
575 U.S. 523 (2015) .......... 11

*Vallone v. CNA Fin. Corp.*,
375 F.3d 623 (7th Cir. 2004) .......... 22

*Williamson v. Curran*,
714 F.3d 432 (7th Cir. 2013) .......... 7

*Winsor v. Sequoia Benefits & Ins. Servs., LLC*,
62 F.4th 517 (9th Cir. 2023) .......... 23

*Yeftich v. Navistar, Inc.*,
722 F.3d 911 (7th Cir. 2013) .......... 7

**Statutes**

29 U.S.C. § 1002(21)(A) .......... 9, 11

29 U.S.C. § 1022 .......... 7, 19

29 U.S.C. § 1104(a)(1)(D) .......... 12

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

29 U.S.C. § 1109 .......... 23

29 U.S.C. § 1132(a)(2) .......... 8, 23

29 U.S.C. § 1132(a)(3) .......... 8

**Other Authorities**

*Meeting Your Fiduciary Responsibilities*, U.S. Dep't of Labor (Sept. 2021), perma.cc/7E4N-3THY .......... 11

**Regulations**

29 C.F.R. § 2509.75-8 D-2 .......... 12

29 C.F.R. § 2520.102-3 .......... 7

29 C.F.R. § 2520.102-3(j)(3) .......... 19

## INTRODUCTION[1]

Few decisions are more important than choosing the right healthcare coverage, and Abbott Laboratories ("Abbott") empowers its employees to make that choice by offering multiple options to fit their needs. Through the Abbott Laboratories Health Care Plan (the "Plan"), eligible employees and retirees can select from two different PPOs that use the same provider network but allow participants to allocate costs differently. The Traditional PPO has higher premiums in exchange for a lower deductible and out-of-pocket maximum. The Health Investment Plan PPO ("HIP PPO") has lower premiums (and access to a Health Savings Account) but a higher deductible and out-of-pocket maximum. Employees make different coverage choices based on their financial circumstances and anticipated healthcare needs: those who expect to have limited medical expenses, for example, may select the HIP PPO, while those who value greater out-of-network coverage may choose the Traditional PPO and pay higher premiums for that benefit.

Both types of PPOs are common in the marketplace, as is the decision to offer a choice between them. And both PPOs were described in Abbott's enrollment materials, which disclosed their coverage and cost-sharing terms and explained that most enrollees in the Traditional PPO would save money if they opted for the HIP PPO instead.

Plaintiffs either chose to enroll in the Traditional PPO or were covered as a beneficiary of an Abbott employee who did. Having made that choice, they now contend that they should not have been given the option at all. According to Plaintiffs, "the Traditional PPO is more expensive than the HIP PPO under every possible in-network spending scenario," ECF No. 52 ("Am. Compl.") ¶ 63, which allegedly made it an unsuitable option regardless of any other features participants might favor. Plaintiffs also contend that Abbott failed to disclose "that the Traditional

[1] Unless otherwise specified, internal quotations and citations are omitted and emphasis is added. "Ex." citations refer to exhibits to the Declaration of Catalina J. Vergara ("Vergara Decl.").

PPO was more expensive for nearly all Plan participants." *Id.* ¶ 126.

Plaintiffs are now on their third bite at the apple. Plaintiff Ebarle filed the original complaint in this action on June 10, 2026, asserting that Abbott violated ERISA "by offering two, *materially identical* healthcare plans, one of which costs more than the other at every level of medical utilization." ECF No. 1 ¶ 3. The other Plaintiffs filed a separate complaint on July 14, similarly claiming that the Traditional PPO "was more expensive than the HIP PPO *regardless* of a participant's healthcare spending, without delivering any additional benefit," and thus should not have been offered. ECF No. 8-1 ¶ 6. In their subsequent consolidated complaint, Plaintiffs began to back away from their original theory, substituting their previous allegations that the Traditional PPO was *always* more expensive than the HIP PPO with allegations that the Traditional PPO was "*virtually always*" more expensive. ECF No. 32 ¶ 62. Defendants moved to dismiss, highlighting Plaintiffs' concession that the Traditional PPO was, at times, the less expensive choice, which contradicted their own definition of a "financially dominated" option. ECF No. 37-1 at 12. Defendants also noted that while Plaintiffs' comparisons focused exclusively on *in-network* benefits, incorporated Plan materials reflected differences in the terms governing *out-of-network* benefits that could make the Traditional PPO a more appealing—and less costly—option for some participants. *Id.* at 12–14. In response, Plaintiffs filed their Amended Consolidated Complaint, which moves even farther away from the concept of "domination" central to their earlier pleadings in an effort to sidestep Abbott's arguments. The latest iteration of the complaint only confirms that no amount of amendment can save Plaintiffs' fundamentally flawed case.

***First***, Abbott's decisions about what benefits to provide, and on what terms, are plan-design decisions made as a "settlor" (*i.e.*, plan sponsor), not as a fiduciary, and cannot be challenged under ERISA's fiduciary-duty provisions. Plaintiffs attempt to frame their claim as a

challenge to the implementation of Abbott's plan-design choices, rather than the plan-design choices themselves. But this argument fails because their claim at its core is that Plan terms should have been changed—a settlor decision that Plan fiduciaries had no authority to make.

***Second***, Plaintiffs' own allegations again defeat the contention that the Traditional PPO is an invariably "inferior option" that could not have been prudently offered. Am. Compl. ¶ 130. While Plaintiffs continue to describe the Traditional PPO as "dominated," *id.* ¶ 11, they do not claim that the Traditional PPO is *always* more expensive than the HIP PPO—even though that is how the economic papers they cite define "domination," *id.* ¶ 49 & nn.15–16. Plaintiffs instead claim only that the Traditional PPO is more expensive "under every possible *in-network* spending scenario." *Id.* ¶ 63. Forced to confront the Traditional PPO's potential cost savings for participants with significant out-of-network spending, Plaintiffs attempt to brush those benefits aside by asserting that "cases involving [a] high level of out-of-network spending" are "rare." *Id.* ¶ 81. And they devise a new definition of "domination"—apparently of their own making—under which an option can still be "dominated" "even if rare and unusual combinations of medical spending can favor the more expensive option." *Id.* ¶ 50.

This watered-down version of "domination" ceases to carry any meaning. That relatively few participants would save money under the Traditional PPO—as Abbott itself disclosed, Am. Compl. ¶¶ 127–30—does not make it unreasonable to offer an option that served those participants' needs. Nor was Abbott required to disregard everything other than year-end cost that participants might reasonably value in choosing a PPO. Plaintiffs' views on which option employees should have favored are not grounds for constraining employee (and employer) choice.

***Third***, while Abbott's communications about the terms of the Plan and its PPO options are subject to ERISA fiduciary standards, Plaintiffs' disclosure claim in Count II still fails because the

Amended Complaint does not plausibly allege that Abbott's communications were materially incomplete or misleading. Plaintiffs' claim rests on the view that disclosing that a substantial portion of employees were enrolled in the Traditional PPO—though true—somehow deceptively portrayed the Traditional PPO as a more compelling option than it really was, even when paired with a statement that 95% or more of Traditional PPO enrollees would save money by choosing the HIP PPO instead. The disclosures themselves demonstrate the implausibility of that theory.

***Fourth***, Plaintiffs' failure-to-monitor and co-fiduciary liability theories are derivative of their other claims and therefore must be dismissed along with them.

***Finally***, to the extent Plaintiffs' claims are brought under ERISA § 502(a)(2), which authorizes participants to seek relief on behalf of a plan only, they fail for the additional reason that Plaintiffs do not allege the Plan was harmed by the conduct they challenge.

For these reasons, explained further below, the Amended Complaint should be dismissed.

## FACTUAL BACKGROUND

### I. THE ABBOTT PLAN

Abbott is a global healthcare company whose mission is to help people live fuller lives. It satisfies that objective by developing revolutionary technologies to support cardiovascular care, diabetes management, diagnostic testing, treatment of pain and movement disorders, and nutrition. Abbott offers the Plan, a self-funded health benefit plan, to eligible employees, retirees, and their families. *See* Am. Compl. ¶¶ 54–56. Employees who choose to enroll in the Plan pay a set amount of money from each paycheck, and those premiums, along with contributions made by Abbott, are used to pay for medical costs incurred by Plan participants and beneficiaries. *Id.* ¶ 56. Abbott is both the sponsor and named fiduciary of the Plan, *id.* ¶ 20, and it retains third-party administrators—Blue Cross Blue Shield ("BCBS") and UnitedHealthcare ("UHC")—to handle enrollment, billing, claims adjudication, and other administrative duties, *id.* ¶ 56.

## II. THE PLAN'S PPO OPTIONS

Between 2020 and 2026, Abbott offered two preferred provider organization ("PPO") options to its employees: the HIP PPO and Traditional PPO, which both are available through the BCBS and UHC networks and cover the same medical services. Am. Compl. ¶¶ 58–59. Variations of these two options are offered by many employers. *See id.* ¶¶ 40–45. At Abbott, the two options "mainly differ in how and when [employees] pay for coverage." *Id.* ¶ 138. Specifically:

- The HIP PPO has a higher deductible and out-of-pocket maximum ("OOP Max") for both in-network and out-of-network medical services, but a lower premium—so it is designed for people who prefer to minimize the amount deducted from their paychecks and are willing to accept a higher deductible and OOP Max if they need medical care, perhaps because they do not anticipate significant medical expenses over the coming year. *See* Am. Compl. ¶¶ 59–60 & n.23; Ex. 2, 2024 UHC Summary Plan Description, at 22; Ex. 3, 2024 BCBS Plan Document and Summary Plan Description, at 16.[2] HIP PPO participants may also be eligible to maintain a tax-deductible Health Savings Account ("HSA") to cover out-of-pocket medical expenses. Am. Compl. ¶ 61 n.24.
- In contrast, the Traditional PPO has a higher premium but a lower deductible and OOP Max for both in-network and out-of-network services. *See* Am. Compl. ¶¶ 59–60 & n.23; *see also* Ex. 2 at 11; Ex. 3 at 8. Employees who select this option contribute more from each paycheck, but they pay less out-of-pocket before reaching their deductible

[2] The Summary Plan Descriptions ("SPDs") and Benefits Highlights Guides are incorporated into the Amended Complaint (*see* Am. Compl. ¶ 60 & n.23) and properly considered in resolving Defendants' motion to dismiss because they are "central to [Plaintiffs'] claim[s] and form the basis of the complaint." *Hecker v. Deere & Co.*, 496 F. Supp. 2d 967, 972 (W.D. Wis. 2007), *aff'd*, 556 F.3d 575 (7th Cir. 2009); *see Fin. Fiduciaries, LLC v. Gannett Co.*, 46 F.4th 654, 663 (7th Cir. 2022) (on a motion to dismiss, "a court may consider documents that are (1) referenced in the plaintiff's complaint, (2) concededly authentic, and (3) central to the plaintiff's claim"); *Stephanie R. v. Blue Cross & Blue Shield of Ill.*, 815 F. Supp. 3d 809, 814 n.1 (N.D. Ill. 2025) ("because various provisions [of SPDs] [we]re referenced in the complaint and g[a]ve rise to the asserted claims, they [we]re incorporated by reference and … properly considered").

or OOP Max. *See* Am. Compl. ¶ 45. The Traditional PPO may be appropriate for employees who anticipate significant future medical expenses at the time of enrollment and wish to minimize their out-of-pocket expenses. Enrollees in this option do not qualify for an HSA or Abbott-contributed HSA funds. *See id.* ¶ 59 & n.22.

How much participants must pay for certain medical services also varies depending on whether they are enrolled in the HIP PPO or Traditional PPO. Under both options, once a participant meets their deductible, the Plan generally pays for 80% of in-network medical services and 60% of out-of-network medical services. *See, e.g.*, Ex. 2 at 18, 28; Ex. 3 at 9, 17. But under the Traditional PPO, participants pay only a copay (typically $25 or $50), even if they have not met their deductible, for services including visits with a primary care, specialist, or mental health physician. *See* Ex. 2 at 11–19; Ex. 3 at 9–14. Under the HIP PPO, participants pay the full amount charged by the provider until they meet their deductible.[3] *See* Ex. 2 at 22–29; Ex. 3 at 16–23.

Additionally, while Plan participants do not pay a separate premium for pharmacy benefits, the two PPO options have different deductible and OOP Max structures for prescription drugs. Under the HIP PPO, the deductible and OOP Max for pharmacy and medical are combined—that is, payments for prescription drugs apply to a participant's deductible and OOP Max in the same way payments for medical services apply. *See* Ex. 2 at 33; Ex. 3 at 24. Under the Traditional PPO, however, participants have a separate (and lower) deductible and OOP Max for pharmacy benefits. *See* Ex. 2 at 33; Ex. 3 at 15. The Plan therefore may contribute towards prescription drug costs sooner for participants enrolled in the Traditional PPO than those enrolled in the HIP PPO, depending on the participant's relative spending on pharmacy and medical services.

[3] The Plan pays for only preventative care and breast pumps before an HIP PPO participant meets their deductible. *See* Ex. 2 at 22–29; Ex. 3 at 16–23.

## III. ABBOTT'S DISCLOSURES

Abbott provides materials to participants that describe its health plan offerings and how they differ. In addition to the SPDs that Abbott is required to furnish under ERISA, *see* 29 U.S.C. § 1022; 29 C.F.R. § 2520.102-3, Abbott also prepares and distributes Benefits Highlights Guides to help employees and retirees make their annual benefit elections. These materials provide participants with information about the premiums, deductibles, OOP Max, and coverage terms for both PPO options. *See, e.g.*, Ex. 1, 2024 Benefits Highlights Guide, at 3. The Guides also clearly state that most employees would save money by enrolling in the HIP PPO, in which "over half" of employees are already enrolled. *See* Am. Compl. ¶ 129; *see also, e.g.*, Ex. 1 at 3; Ex. 4, 2025 Benefits Highlights Guide, at 3; Ex. 5, 2023 Benefits Highlights Guide, at 3.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed if it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plausible claim requires allegations of fact—not mere "labels and conclusions"—permitting an inference that the defendant is liable. *Twombly*, 550 U.S. at 555. Although a complaint's factual allegations are generally accepted as true, the Court need not accept conclusory allegations unsupported by well-pled facts. *See Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013). When a document incorporated into the complaint "contradicts the allegations in the complaint, the [document] ordinarily controls … ." *Bogie v. Rosenberg*, 705 F.3d 603, 608–09 (7th Cir. 2013); *see also, e.g.*, *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

"In putative ERISA class actions, Rule 12(b)(6) motions are an important mechanism for weeding out meritless claims." *Albert v. Oshkosh Corp.*, 47 F.4th 570, 577 (7th Cir. 2022).

## ARGUMENT

Plaintiffs are current and former Plan participants and beneficiaries. Am. Compl. ¶¶ 13–18. They bring three claims under ERISA §§ 502(a)(2) and 502(a)(3), 29 U.S.C. §§ 1132(a)(2), (3), alleging that Defendants[4] breached their fiduciary duties in connection with the Plan. Count I alleges that Defendants breached ERISA's duties of prudence and loyalty by offering the Traditional PPO, which Plaintiffs contend was not a reasonable option because it was "virtually always more expensive" than the HIP PPO. Am. Compl. ¶¶ 70, 158–65. Count II alleges that Defendants breached their fiduciary duties by failing to disclose that "the Traditional PPO would cost participants more than the HIP PPO in virtually every utilization scenario." *Id.* ¶¶ 166–72. Count III alleges that Defendants breached their duty to monitor those responsible for selecting and administering the HIP PPO and Traditional PPO and are liable as co-fiduciaries for asserted breaches by other Defendants. *Id.* ¶¶ 173–79. Plaintiffs maintain they suffered financial harm from these alleged breaches "in the form of excess premium contributions, forgone employer contributions, and avoidable out-of-pocket expenses." *Id.* ¶ 10. These claims are without merit.

### I. COUNT I FAILS BECAUSE IT CHALLENGES NON-FIDUCIARY PLAN DESIGN DECISIONS AND DOES NOT PLAUSIBLY ALLEGE THAT NO EMPLOYER COULD REASONABLY OFFER THE TRADITIONAL PPO.

#### A. Count I Does Not State a Claim for Breach of Fiduciary Duty Because It Challenges Non-Fiduciary, Settlor Decisions.

"In every case charging breach of ERISA fiduciary duty," the "threshold question" is whether the defendant "was acting as a fiduciary … when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000). If the challenged conduct is not a fiduciary function, any claim for breach of fiduciary duty necessarily fails. *See, e.g.*, *Larson v. United*

[4] Plaintiffs name as a Defendant an entity they refer to as "The Abbott Laboratories Employee Benefits Committee." There is no such committee, or any equivalent, at Abbott.

*Healthcare Ins. Co.*, 723 F.3d 905, 917 (7th Cir. 2013); *Bator v. Dist. Council 4*, 972 F.3d 924, 931 (7th Cir. 2020). Here, Abbott's decisions about what health benefits to offer are quintessential "settlor" functions and thus cannot be challenged under ERISA's fiduciary-duty provisions. *See Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995).

An employer acts as a fiduciary when it "exercises discretionary authority over plan management, administration, or the disposition of plan assets," Am. Compl. ¶ 112; *see* 29 U.S.C. § 1002(21)(A), but it is well-settled that "an employer's decisions about the content of a plan are not themselves fiduciary acts." *Pegram*, 530 U.S. at 226; *see Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 788 (7th Cir. 2005). Rather, under ERISA, employers are "generally free" to make plan-design decisions "for any reason at any time," in their "settlor" capacity. *Curtiss-Wright*, 514 U.S. at 78; *see also, e.g.*, *Cortes v. Midway Games, Inc.*, 2004 WL 2367738, at *9 (N.D. Ill. 2004).

The distinction between settlor and fiduciary functions is central to the balancing of interests embodied in ERISA, which is designed to encourage employers to establish benefit plans while ensuring that participants and beneficiaries receive promised benefits once a plan is in place. *See Conkright v. Frommert*, 559 U.S. 506, 516–17 (2010); *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996). The ability to serve as both a settlor and fiduciary is "necessary to encourage employers to establish benefit plans." *Halperin v. Richards*, 7 F.4th 534, 547 (7th Cir. 2021). Otherwise, "employers that establish ERISA plans would be assuming financial liabilities without effective controls." *Id.* This is particularly so in the case of a self-funded health plan, where the employer assumes the risk of paying participant healthcare expenses. *See* Am. Compl. ¶ 34.

#### i. Abbott's Decisions About What PPO Options to Offer and on What Terms Are Core Settlor Functions.

Applying these principles, courts have consistently held that decisions about the financial terms on which benefits will be offered, including the premiums and deductible that will be

applied, are matters of plan design not subject to ERISA fiduciary duties. *See Argay v. Nat'l Grid USA Serv. Co.*, 503 F. App'x 40, 42 (2d Cir. 2012) (holding that defendants "did not act in a fiduciary capacity in setting premiums"); *Stern v. JPMorgan Chase & Co.*, 2026 WL 654714, at *12 (S.D.N.Y. 2026) (explaining that "determining cost-sharing terms[] and choosing between pricing models are components of benefit design"); *see also Bator*, 972 F.3d at 932 ("'select[ing] levels of funding' to the plan by setting the contribution rates" is a settlor act); *Frahm v. Equitable Life Assurance Soc'y of U.S.*, 137 F.3d 955, 956, 962 (7th Cir. 1998) (affirming judgment that employer retained the "power to change the health plan at any time" even when changes included "significantly higher payment obligations on its participants and beneficiaries with respect to premiums, deductibles, co-payments, and maximum out-of-pocket limitations").

As these cases make plain, Abbott's choice to offer the Traditional PPO alongside the HIP PPO, and its decisions about what services would be covered under the two options and on what financial terms, are core settlor decisions. Plaintiffs cannot transform these settlor choices into fiduciary conduct by characterizing them as matters of "administration and implementation of the Plan." Am. Compl. ¶ 118. Plaintiffs' central claim is about the *design* of Abbott's health benefit offerings, not how those offerings were *administered*; Plaintiffs allege that Abbott could have "eliminated, redesigned, or repriced the dominated Traditional PPO" and violated ERISA by not doing so. *Id.* ¶ 11. The design of health benefit offerings is a non-fiduciary, settlor function as a matter of law. *See Larson*, 723 F.3d at 917 (claim did not challenge a "fiduciary act" because it "target[ed] decisionmaking about policy terms"); *Senn v. United Dominion Indus., Inc.*, 951 F.2d 806, 817 (7th Cir. 1992) ("There is a world of difference between administering a welfare plan in accordance with its terms and deciding what those terms are to be. A company acts as a fiduciary in performing the first task, but not the second.").

### ii. Plaintiffs' Cited Authority Does Not Transform Abbott's Plan-Design Decisions Into Fiduciary Acts.

The cases and regulatory guidance cited in the Amended Complaint do not support Plaintiffs' theory of fiduciary status. None of those authorities treat setting the terms on which coverage is offered under a health benefit plan as a fiduciary matter. Rather, each concerns a different kind of decision: which investment options will be offered in a retirement plan, or which service providers will be paid with plan assets, and how much. *See* Am. Compl. ¶¶ 92–95 & nn.39–41 (citing U.S. Department of Labor information letter about evaluating health-care providers' qualifications, service quality, and "the reasonableness of the fees charged"); *id.* ¶¶ 5, 102–06, 125 (citing *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015) and *Hughes v. Nw. Univ.*, 595 U.S. 170, 175–77 (2022), which address selection and monitoring of plan investment options); *id.* ¶ 114 (citing *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016), addressing selection, monitoring, and removal of plan investments).[5] That difference is crucial, because the selection of service providers and investment options are discretionary decisions about what happens to funds already contributed to a plan—classic fiduciary functions under ERISA. *See* 29 U.S.C. § 1002(21)(A); *Howell v. Motorola, Inc.*, 633 F.3d 552, 562, 567 (7th Cir. 2011) (selection of investment options is "a core decision relating to the administration of the plan"); *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 788 (7th Cir. 2011) (noting that "Plan fiduciaries hired various service providers" "[i]n connection with their administration of the Plan"). Plaintiffs, however, do not challenge Abbott's selection of the Plan's third-party administrators or any other service provider, nor do they otherwise take aim at Abbott's handling of contributions after they were

[5] Plaintiffs' other sources merely describe the content of ERISA's fiduciary duties where they apply, *see* Am. Compl. ¶¶ 96–97 & nn.42–44, and recognize that decisions "to determine the benefit package" and "include certain features in a plan" are "not governed by ERISA." *Meeting Your Fiduciary Responsibilities*, U.S. Dep't of Labor (Sept. 2021), perma.cc/7E4N-3THY.

made. Plaintiffs instead challenge Abbott's decisions when setting premiums, deductibles, and out-of-pocket maximums, which are terms that define the benefit.[6]

Plaintiffs' extended analogy to the selection of investment options for defined-contribution retirement plans, Am. Compl. ¶¶ 102–06, 114–17, thus is inapt. Abbott's decisions about the financial terms of the Traditional PPO are not akin to the selection of retirement plan investment options, but to the rules governing contributions to such a plan, which are well-established settlor decisions. *See Coulter v. Morgan Stanley & Co.*, 753 F.3d 361, 367 (2d Cir. 2014) ("non-fiduciary duties generally include 'decisions relating to the timing and amount of contributions'"). The cases cited in the Amended Complaint underscore the point. In *Johnson v. Georgia-Pacific Corp.*, 19 F.3d 1184 (7th Cir. 1994), for example, the Seventh Circuit explained that employers "select[ing] levels of [plan] funding … are no more the employees' 'fiduciaries' than when they decide what wages to offer or whether to close the plant and lay the workers off." *Id.* at 1188; *see also Akers v. Palmer*, 71 F.3d 226, 230–31 (6th Cir. 1995) (rejecting argument that transfer of funds to serve as an initial contribution to a plan was subject to fiduciary standards).

Nor can Plaintiffs subject the Plan's terms to fiduciary review by faulting the Plan's administrators for failing to revise or disregard terms they had no authority to change. *See* Am. Compl. ¶ 146. *Dudenhoeffer*'s statement that "the duty of prudence trumps the instructions of a plan document," *id.* ¶ 105 (quoting *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014)), does not indicate otherwise. That rule comes from ERISA's directive that a fiduciary, when discharging its duties, must follow the terms of the plan documents insofar as they are

[6] That premiums deducted from paychecks become "plan assets," Am. Compl. ¶¶ 4, 57, 91, is immaterial. Fiduciary duties govern the management of plan assets *once contributed*, but setting contribution amounts is a settlor function, and collecting contributions is ministerial. 29 C.F.R. § 2509.75-8 D-2; *see Assocs. in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*, 729 F. Supp. 1162, 1181 (N.D. Ill. 1989), *aff'd*, 941 F.2d 561 (7th Cir. 1991).

consistent with ERISA. 29 U.S.C. § 1104(a)(1)(D). It requires those performing fiduciary functions to disregard plan instructions that would be imprudent to follow, "such as an instruction to invest exclusively in employer stock." *Dudenhoeffer*, 573 U.S. at 421. That principle has no application where, as here, the decisions at issue—setting the financial terms of a health benefit plan—are not subject to ERISA fiduciary duties. ERISA's fiduciary provisions place no limits on the premiums, deductibles, co-payments, or other financial terms a sponsor may adopt, which are matters of settlor choice, and Plaintiffs do not allege that any Plan term violates any other ERISA requirement. There is thus no inconsistency between Plan terms and ERISA duties to be resolved.

**iii. The Actions Plaintiffs Challenge Are Plan-Design Decisions.**

Whether Abbott acted as a settlor or fiduciary depends on whether Abbott was acting as a fiduciary "when taking the action subject to complaint." *Pegram*, 530 U.S. at 226. While Plaintiffs identify various functions *other than* setting the Plan's terms that were allegedly fiduciary in nature, *see* Am. Compl. ¶ 145, the conduct Plaintiffs challenge is Abbott's failure to change *the Plan terms*, not its administration of the terms as written. That Plaintiffs are challenging settlor functions is confirmed by the relief they seek: "eliminating, redesigning, or repricing" the Traditional PPO. *Id.* ¶ 137; *see id.* ¶ 146(a), Prayer For Relief ¶ E. And when Abbott "sets, changes, *or enforces* contribution rates, [it] acts as a settlor because it is selecting levels of funding to the plan by setting the contribution rates." *Bator*, 972 F.3d at 932. Absent allegations that Abbott collected more than the Plan required, delayed or diverted any contribution, or spent contributions on anything but Plan benefits, Plaintiffs do not allege a fiduciary breach. *See Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 913 (7th Cir. 2013) (control over management or disposition of plan assets supports fiduciary status only for claims that "arise from" handling of those assets); *Larson*, 723 F.3d at 917 (alleged failure to eliminate illegal copayment provisions was "a challenge to the content of the insurance policies" and "decisions about the

content of a plan are not … fiduciary acts”).

Courts in this Circuit routinely resolve settlor-versus-fiduciary questions at the motion-to-dismiss stage, and this Court should do the same. *See, e.g.*, *Bator*, 972 F.3d at 931; *Sullivan v. Cuna Mut. Ins. Soc'y*, 683 F. Supp. 2d 918, 934–35 (W.D. Wis. 2010); *Hecker*, 496 F. Supp. 2d at 977. Even accepting Plaintiffs' factual allegations as true, Count I challenges only Abbott's decisions about which PPO options to offer and how much to charge for them. *See* Am. Compl. ¶ 3. Those decisions cannot be challenged under ERISA. Count I should be dismissed.

### B. Count I Also Fails Because Offering an Option That Benefits Some Participants Is Not Imprudent.

Count I separately fails because Plaintiffs' own allegations undercut the premise that the Traditional PPO and HIP PPO are “the same product sold at different price points,” such that there could be no valid rationale for offering participants a choice between them. Am. Compl. ¶ 64.

While Plaintiffs continue to assert in general terms that “participants choosing [the Traditional PPO] option would pay more than necessary, regardless of their level of medical spending,” Am. Compl. ¶ 71, they simultaneously acknowledge that the “Traditional PPO's lower out-of-network deductibles,” *id.* ¶ 72, can make it the less expensive option for some participants, *id.* ¶ 81. In doing so, Plaintiffs effectively concede that the Traditional PPO is not a “dominated” option: an option “that costs more, for the same coverage, than another available option regardless of how much a participant spends on healthcare.” *Id.* ¶ 49. Plaintiffs' tacked-on qualification that “a dominated option may be economically inferior in the overwhelming majority of foreseeable utilization scenarios, even if rare and unusual combinations of medical spending can favor the more expensive option,” *id.* ¶ 50—a contention for which they offer no support, *see id.*—only underscores the emptiness of their use of the “domination” label.

By Plaintiffs' own account, Abbott offers PPO choices that serve participants with different

needs. While Plaintiffs' comparison of the HIP PPO and Traditional PPO focuses principally on in-network utilization and costs, Am. Compl. ¶¶ 59–71, differences in out-of-network coverage illustrate the potential scenarios in which the Traditional PPO may be more cost-effective. Plaintiffs minimize the potential advantages of the Traditional PPO's lower out-of-network deductible and OOP Max, arguing that, in 2024, a participant who selected the HIP PPO at the employee-only tier and incurred $2,500 in out-of-network medical expenses would incur $2,800 in costs, compared to $3,124 in costs for the same level of out-of-network spending under the Traditional PPO. *Id.* ¶ 82. But as shown below, an employee-only tier participant who spent slightly more on out-of-network care—$3,373—would pay the same under both options, and one who spent more than $3,373 on out-of-network care would pay less under the Traditional PPO.[7]

| **Out-of-Network Spending Amount[8]** | **HIP PPO Cost (Net of HSA Contribution)[9]** | **Traditional PPO Cost[10]** | **Lower-Cost Option** |
|---|---|---|---|
| **$0** | $100 | $1,764 | HIP PPO |
| **$2,500** | $2,600 | $3,124 | HIP PPO |
| **$3,373** | $3,473 | $3,473 | -- |
| **$3,700** | $3,800 | $3,604 | Traditional PPO |
| **$5,000** | $4,320 | $4,124 | Traditional PPO |
| **$10,000** | $6,320 | $6,124 | Traditional PPO |
| **$17,100** | $9,160 | $8,964 | Traditional PPO |
| **$18,450 and above** | $9,700 | $8,964 | Traditional PPO |

[7] The chart applies the 2024 employee-only terms set out in Figure 1 of the Amended Complaint using Plaintiffs' methodology in paragraph 82. *See* Am. Compl. ¶¶ 60 (Fig. 1), 82.

[8] Consistent with Plaintiffs' example in Amended Complaint ¶ 82, the calculations in this chart assume zero in-network spending.

[9] Each "cost" total includes annual premiums and the participant's share of medical expenses, less any Abbott HSA contribution for which participants are eligible. Under the HIP PPO, participants pay $300 in premiums, offset by a $200 HSA contribution, plus the first $3,700 of medical expenses and 40% thereafter, capped at $9,600. *See* Am. Compl. ¶¶ 60, 82; Ex. 2 at 22; Ex. 3 at 16–17.

[10] Under the Traditional PPO, participants pay $1,764 in premiums (and are not eligible for an HSA contribution), plus the first $600 of medical expenses and 40% thereafter, capped at $7,200. *See* Am. Compl. ¶¶ 60, 82; Ex. 2 at 11; Ex. 3 at 8.

Looking at out-of-network spending in combination with in-network medical expenses does not change the bottom-line point that the Traditional PPO is less expensive in some scenarios. Indeed, Plaintiffs calculate that, for an employee-only participant with in-network spending of $500, the Traditional PPO becomes the more cost-effective option once out-of-network spending exceeds $2,975. Am. Compl. ¶ 83; *see also id.* ¶ 85 (acknowledging there are combinations of in-network and out-of-network spending where the Traditional PPO costs less under other coverage tiers). An option that saves participants money at unremarkable spending thresholds is not one that "costs more … regardless of how much a participant spends on healthcare," *id.* ¶ 49, nor does offering it present participants with a "Hobson's choice," *id.* ¶ 11. Plaintiffs' argument thus reduces to one of degree: that the scenarios in which the Traditional PPO costs less arise relatively infrequently, and the savings realized are "generally significantly smaller" than the margin by which the Traditional PPO's costs exceed those of the HIP PPO in more common spending scenarios. *Id.* ¶ 81. Even accepting that as true, Plaintiffs fail to explain why Abbott should have been prohibited from offering an option that, by their own account, may save employees money.[11]

Beyond cost comparisons, Plaintiffs' theory that the Traditional PPO should not even have been offered as an option also ignores broader realities about how people choose health plans. Plaintiffs assume that the total cost at the end of the year is the only relevant factor for employees deciding which option is best for them and their families. But it can be difficult to predict anticipated healthcare costs for the coming year in advance, and many individuals and families may simply prefer to have greater stability in planning for and managing the costs they will have

[11] Plaintiffs' speculation that "plan choice is sticky," so that any savings in one year would "very likely" be offset in later years (Am. Compl. ¶ 86), changes nothing. Participants choose a PPO option each year at open enrollment and can change their elections if their circumstances change. And Plaintiffs offer no reason to think a participant who saves money under the Traditional PPO one year would not do so again.

to pay. The Traditional PPO offers participants modest, predictable payments for many routine in-network services like appointments with primary care physicians or specialists. An HIP PPO participant is responsible for the entire cost of their care until they reach their deductible—a scenario that could result in a participant having to pay hundreds or thousands of dollars all at once for expenses they did not anticipate. Participants who may not have enough liquidity to cover large or unexpected medical bills may reasonably prefer a plan that protects against this possibility. Yet Plaintiffs ignore that some employees may prefer to pay slightly more in overall cost in exchange for the stability that the Traditional PPO provides.[12]

Plaintiffs' failure to plausibly allege that the Traditional PPO was an unreasonable option for Abbott to offer its employees separately requires dismissal of Count I.

### C. To the Extent Plaintiffs Assert a Disloyalty Claim in Count I, It Also Fails.

Plaintiffs' passing suggestion that Abbott's decision to offer the Traditional PPO was infected by fiduciary disloyalty also falls short of what is required to state a claim. Count I asserts that Defendants were disloyal because they retained "an option that caused participants to pay excess costs for no commensurate participant benefit." Am. Compl. ¶ 163. That is Plaintiffs' prudence claim with a different label, *see id.* ¶ 161, and it fails for that reason alone. *See Albert v. Oshkosh Corp.*, 2021 WL 3932029, at *7 (E.D. Wis. 2021) (claim "must do more than recast allegations of purported breaches of fiduciary duty as disloyal acts"), *aff'd*, 47 F.4th 570 (7th Cir. 2022); *Martin v. CareerBuilder, LLC*, 2020 WL 3578022, at *6 (N.D. Ill. 2020) (similar).

Any disloyalty theory also fails because setting contribution and cost-sharing amounts is a non-fiduciary matter of plan design to which ERISA's duty of loyalty does not apply. *See Hughes*

[12] In addition, the Traditional PPO's separate pharmacy deductible and OOP Max mean the Plan may begin paying drug costs earlier in the year, *see* Ex. 2 at 33; Ex. 3 at 15, 24, a cost-smoothing benefit participants might reasonably value even if the ultimate annual costs are not lower, *see* Am. Compl. ¶¶ 73–74.

*Aircraft Co. v. Jacobson*, 525 U.S. 432, 443–44 (1999); *Lockheed*, 517 U.S. at 890–91.

The Amended Complaint, moreover, alleges only an asserted effect on Abbott's costs of providing coverage, rather than facts plausibly suggesting that Abbott acted "*for the purpose* of" benefiting itself. *Patterson v. Morgan Stanley*, 2019 WL 4934834, at *12 (S.D.N.Y. 2019). In an apparent attempt to conjure a disloyal motivation for Abbott's choices, Plaintiffs assert that the higher contributions paid by Traditional PPO enrollees "reduce Defendants' cost of funding the Plan, because a greater share of the Plan's costs are shifted to participants." Am. Compl. ¶ 88. But, as discussed above, there are circumstances in which participants could logically prefer the Traditional PPO. *See supra* at 14–17. The Amended Complaint provides no basis to infer that Abbott's "operative motive" in offering the Traditional PPO was anything other than a desire to meet the needs of employees and retirees that valued the Traditional PPO's distinct features. *Albert*, 47 F.4th at 583 (quoting *Forman v. TriHealth, Inc.*, 40 F.4th 443, 450 (6th Cir. 2022)).

Plaintiffs' own allegations about Abbott's disclosures also undercut any inference of a disloyal motive. As the Amended Complaint acknowledges, Abbott told participants that "over 95% of employees in the Traditional PPO actually would save money if enrolled in the HIP PPO." Am. Compl. ¶¶ 129–30. On Plaintiffs' theory, every enrollee who acted on that information would have reduced the amount of employee contributions made to the Plan (increasing Abbott's share of the funds needed to pay claims) and also potentially become eligible for an Abbott-funded HSA contribution. *See id.* ¶ 59 & n.22, ¶ 61 n.24. An employer disloyally seeking to extract higher premiums would not tell its employees they would likely save money by choosing the lower-premium option. And, as discussed above, the Traditional PPO's higher contributions purchase something real: a lower deductible and lower OOP Max, *id.* ¶ 63, under which the Plan bears a greater share of participants' claims costs, which Abbott shares responsibility for funding, *see id.*

¶¶ 34, 36, 56. Plaintiffs' theory of disloyalty is not plausible and should be rejected.

## II. COUNT II DOES NOT PLAUSIBLY ALLEGE A BREACH OF THE DUTY TO DISCLOSE PLAN-RELATED INFORMATION TO PARTICIPANTS.

Plaintiffs fare no better in attempting to recast their attack on the design of Abbott's health benefit offerings as a failure to adequately disclose information about those options. Count II alleges that "Defendants breached their duties by failing to disclose—let alone in a clear, prominent, and actionable manner—that the Traditional PPO would cost participants more than the HIP PPO in virtually every utilization scenario, for the same covered medical treatment and provider access." Am. Compl. ¶ 168. But the Amended Complaint acknowledges that Abbott told participants that the PPO options shared "the same" network and covered "the same" services, *id.* ¶¶ 59, 138, 142, and that "over 95% of employees in the Traditional PPO actually would save money if enrolled in the HIP PPO," *id.* ¶ 129 (2024 Benefits Highlights Guide); *see also id.* ¶ 127 & n.46 (citing the 2017 Guide which stated that "[o]ver 90 percent of Abbott employees would save money if enrolled in the [HIP PPO]"). To the extent that Plaintiffs contend Abbott should have said the Traditional PPO was *never* the better choice, *see id.* ¶ 169, the Amended Complaint's own allegations show that would have been false. *See supra* at 14–16. ERISA does not require a fiduciary to disclose in a different way what it has already disclosed, or to make a statement Plaintiffs themselves do not plausibly allege is true. And the Amended Complaint identifies nothing ERISA *did* require Abbott to disclose that was omitted.

### A. Abbott Disclosed the Information Required Under ERISA.

ERISA requires plan administrators to provide participants with SPDs that include specific information about the plan's terms, including, among other things, "any cost-sharing provisions, including premiums, deductibles, coinsurance, and copayment amounts for which the participant or beneficiary will be responsible." 29 C.F.R. § 2520.102-3(j)(3); *see* 29 U.S.C. § 1022; *Baker v.*

*Kingsley*, 387 F.3d 649, 662 (7th Cir. 2004). Fiduciaries that make "an intentionally misleading statement" about plan terms, "or a material omission where the fiduciary's silence can be construed as misleading" may also violate "the general fiduciary duties imposed by ERISA § 404(a)(1)." *Howell*, 633 F.3d at 571. For written disclosures (as opposed to oral discussions between participants and plan personnel), a claim may arise where fiduciaries fail to take "reasonable steps" to ensure participants have "accurate and complete information" about their benefits by providing plan documents that are "silent or ambiguous on a recurring topic," *Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452, 470–72 (7th Cir. 2010), such as whether a plan covers treatment in particular circumstances, *see id.* at 472–75, or how a break in employment affects pre-existing-condition coverage, *see Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 587, 590–91 (7th Cir. 2000).

Abbott's SPDs complied with ERISA's requirements. Abbott published the premium, deductible, coinsurance, copayment, and out-of-pocket maximum for each PPO option, including the different terms for in-network and out-of-network care, and provided a side-by-side comparison of the respective premiums. Am. Compl. ¶¶ 60, 64–65; *see* Ex. 2 at 11–19, 22–29; Ex. 3 at 8–14, 16–23. Moreover, in addition to supplying the SPDs ERISA requires, Abbott also provided other resources to help its employees and retirees make their benefit elections, including Benefits Highlights Guides, toll-free helplines, and care coordinators. *See, e.g.*, Ex. 1 at 3.

Plaintiffs nonetheless assert that Abbott's communications were inadequate because they did not state, in so many words, that "the Traditional PPO would cost participants more than the HIP PPO in virtually every utilization scenario, for the same covered medical treatment and provider access." Am. Compl. ¶ 168. What Plaintiffs claim Abbott should have disclosed is not information about Plan benefits that participants misunderstood, but a comparative economic judgment derived from disclosed Plan terms. As courts have observed, it "would be strange indeed

if ERISA's fiduciary standards could be used to imply a duty to disclose information that ERISA's detailed disclosure provisions do not require to be disclosed." *Ehlmann v. Kaiser Found. Health Plan of Tex.*, 198 F.3d 552, 555 (5th Cir. 2000); *see Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 405–06 (6th Cir. 1998) (rejecting claim based on alleged omissions from SPDs and observing "[w]e are not aware of any court of appeals decision imposing fiduciary liability for a failure to disclose information that is not required to be disclosed"). Plaintiffs' claim fails for the same reason—Abbott disclosed the information ERISA requires, and nothing required Abbott to say more. *Cf. Kamler v. H/N Telecomm. Servs., Inc.*, 305 F.3d 672, 682 (7th Cir. 2002) (finding no duty to emphasize to participants a requirement that the plan document made "abundantly clear").

### B. Plaintiffs Do Not Plausibly Allege That Abbott's Communications About the Plan Were Materially Misleading.

Plaintiffs also do not plausibly allege that Abbott's disclosures were materially misleading. Plaintiffs' claim focuses on a single passage in the 2024 Benefits Highlights Guide:

> **Which medical plan is right for you?**
> It depends on your needs. Over half of employees are in the HIP PPO, and we've found that over 95% of employees in the Traditional PPO actually would save money if enrolled in the HIP PPO.

Am. Compl. ¶ 129. Plaintiffs do not allege anything in this statement is untrue. They instead contend that pairing the "over 95%" figure with the "over half" figure "obfuscated" that "virtually all participants" would save money in the HIP PPO and implied that the Traditional PPO was "the 'right' choice for close to half of employees." *Id.* ¶ 130. On its face, however, the statement simply tells participants that the majority of Abbott employees are enrolled in the HIP PPO, and that over 95% of employees in the Traditional PPO would save money if they switched. To the extent the disclosure implies anything about which option is "right" for most participants, it suggests that option is the HIP PPO. The passage is "a clear, prominent, and actionable" disclosure

that most participants would save money in the HIP PPO. *Id.* ¶ 168.[13]

To the extent Plaintiffs mean to suggest that Abbott should have told participants that the Traditional PPO was *never* a better economic choice, *see* Am. Compl. ¶ 125, the Amended Complaint does not plausibly establish that premise, as discussed above in Count I. *See supra* at 14–17. Plaintiffs' claim also fails insofar as it rests on the premise that Abbott was required to disclose an alleged "per-scenario dollar penalty" for selecting the Traditional PPO or describe the "magnitude" of the cost difference or the "limited circumstances" in which the Traditional PPO saves participants money. *See* Am. Compl. ¶¶ 132, 146(c), (f). ERISA does not require "plan administrators to investigate each participant's circumstances and prepare advisory opinions for literally thousands of employees." *Bowerman*, 226 F.3d at 590–91.[14]

Ultimately, "if accurate written information is provided," there is no breach of fiduciary duty, even if plaintiffs would have preferred the disclosures to be worded differently. *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 642 (7th Cir. 2004). Abbott gave participants all of the information required under ERISA—and more—to help them evaluate the differences between the Traditional PPO and HIP PPO and decide which option was right for them. Count II should be dismissed.

## III. COUNT III IS DERIVATIVE OF PLAINTIFFS' OTHER CLAIMS AND CANNOT SURVIVE ON ITS OWN.

Plaintiffs' failure-to-monitor and co-fiduciary liability claim in Count III must be dismissed because it is derivative in nature and cannot proceed absent a plausible claim for breach of fiduciary duty in Count I or II. *See Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan by &*

---

[13] Plaintiffs suggest that Abbott's disclosures *must* have been misleading or inadequate because a substantial percentage of Abbott employees enrolled in the Traditional PPO despite disclosures that over 90 or 95% of them would save money in the HIP PPO. *See* Am. Compl. ¶¶ 128–30. But as discussed above, the Traditional PPO has benefits participants might favor. *See supra* at 14–17. That some participants made a selection Plaintiffs believe they should have does not make Abbott's disclosures misleading.

[14] Moreover, as Plaintiffs acknowledge, Abbott provided access to "tools that projected employees' total expected costs under each option," Am. Compl. ¶ 128, enabling them to assess how costs would compare.

*through Lyon v. Buth*, 99 F.4th 928, 949 (7th Cir. 2024); *Albert*, 47 F.4th at 583. Because Plaintiffs have not stated a claim under Counts I and II, Count III also fails.

## IV. PLAINTIFFS' CLAIMS ALSO FAIL AS A MATTER OF LAW TO THE EXTENT THEY ARE BROUGHT UNDER ERISA § 502(A)(2).

All of Plaintiffs' claims should be dismissed in full for the reasons explained above. But to the extent those claims are brought under ERISA § 502(a)(2), they also fail for another reason: ERISA § 502(a)(2) authorizes participants to seek relief only *on behalf of the plan*. *See* 29 U.S.C. §§ 1109, 1132(a)(2); *Peabody v. Davis,* 636 F.3d 368, 373 (7th Cir. 2011). Plaintiffs do not articulate any theory as to how the Plan was allegedly injured by the conduct they challenge; they do not allege that the Plan overpaid, lost assets, or otherwise suffered any financial harm because Abbott offered the Traditional PPO. To the contrary, they allege that the Plan *gained* money: "every dollar a participant overpaid or forewent in HSA contributions was a dollar the Plan accrued." Am. Compl. ¶ 11. Plaintiffs' claims focus not on harm to the Plan, but on purported individual harms in the form of premium payments and out-of-pocket costs, *see id.* ¶¶ 147, 165, 172, which do not support a claim under ERISA § 502(a)(2). *See Smith v. Med. Benefit Adm'rs Grp., Inc.*, 639 F.3d 277, 282–83 (7th Cir. 2011) (plaintiff who sought "relief for injuries that *he*, rather than his plan, suffered" had "no viable claim … under section 502(a)(2)").

For the same core reason, the Court cannot redress the individual injuries Plaintiffs assert under ERISA § 502(a)(2). Any recovery would go to the Plan, and Abbott would not be obligated to reduce participant contributions or co-payments or otherwise distribute the funds to participants. *See Winsor v. Sequoia Benefits & Ins. Servs., LLC*, 62 F.4th 517, 526–27 (9th Cir. 2023); *Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123, 1125 (9th Cir. 2006).

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Amended Complaint in its entirety.

Dated: November 17, 2026

Respectfully submitted,

*/s/ Catalina Vergara*

Catalina Vergara (admitted *pro hac vice*)
O'MELVENY & MYERS LLP
400 South Hope Street, 19th Floor
Los Angeles, CA 90071
(213) 430-6000
cvergara@omm.com

Meaghan VerGow (admitted *pro hac vice*)
Deanna Rice (admitted *pro hac vice*)
Meredith Garagiola (admitted *pro hac vice*)
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300
mvergow@omm.com
derice@omm.com
mgaragiola@omm.com

Nick Kahlon
Megan DeMarco
RILEY SAFER HOLMES & CANCILA LLP
1 South Dearborn Street, Suite 2200
Chicago, IL 60603
(312) 471-8700
nkahlon@rshc-law.com
mdemarco@rshc-law.com

*Counsel for Defendants Abbott Laboratories et al.*

## CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2026, I caused a copy of the foregoing document to be electronically filed with the Clerk of Court through the CM/ECF system, which will send notification of such filing to all counsel of record at the email addresses on file with the Court.

Dated: November 17, 2026

*/s/ Catalina Vergara*
Catalina Vergara